# SOUTHERN RAILWAY COMPANY *v.* ATLANTA SAND AND SUPPLY COMPANY.

1. Storage rule number nine of the railroad commission of Georgia, adopted under authority of the act of 1905 (Acts 1905, p. 120)', reads as follows: "Railroad companies are required to furnish cars promptly upon request therefor. When a shipper files with a railroad company written application for a car or cars, stating therein the character of freight to be shipped, and its destination, such railroad company shall furnish same within four days (Sundays and legal holidays excepted) from seven o'clock a. m of the day following the receipt of such application. For a violation of this rule the railroad company at fault shall, within thirty days after demand in writing is made therefor, pay to the shipper so offended the sum of one dollar per car per day, or fraction of a day, after expiration of free time, during which such violation continues." *Held,* that such rule applies where cars are intended to be used for intrastate shipments, and also where it is intended that cars are to be used for the shipment of freight from a point in this State to a destination in another State.

2. Prior to the repeal of the third section of the act of 1905, a shipper filed with the railroad commission a complaint, setting forth a violation of rule nine above quoted, and giving the details of such violation by a named railroad company. Thereupon the secretary of the commission

addressed a letter to the manager of the railroad company, who handled claims and demurrage complaints, enclosing a copy of the complaint, and adding, "You will please show cause at the earliest practical time, if any you had, [can?] why this claim should not be paid." The manager replied, acknowledging the receipt of the letter, and setting up that he had investigated the complaint, and that his investigation had developed that all orders for cars were promptly filled, that no discrimination was practiced in the distribution of cars, that shippers were furnished all cars that the railroad company had for loading, that he understood that suit had been brought on the claim, and that he did not suppose that it was worth while for him to undertake to answer the complaint in detail. *Held*, that this gave the railroad commission sufficient jurisdiction to authorize that body, on the next day after the receipt of the reply from the railroad manager, without further hearing, to pass an order declaring that the commission was of the opinion "that sufficient cause had not been shown to relieve said railroad company of the penalty claimed," and thus to leave the complainant free to bring suit against the railroad company under the act of the legislature and the rule of the commission.

3. Under the third section of the act of August 23, 1905 (prior to its repeal, August 23, 1907), a decision of the railroad commission that a railroad company had not shown sufficient cause to relieve itself from liability did not conclude the company as to the question of such liability, upon a suit by the complaining shipper for the amount claimed by him against the company for a failure to furnish cars on written demand within four days, as provided by the rule of the commission.

4. Storage rule number nine of the railroad commission of this State, quoted in the first headnote, properly construed in the light of the act of the legislature authorizing its adoption, is a reasonable rule.

5. In the construction of a statute the courts will not generally attribute to the legislature the intention to punish the failure to do an impossible thing, if another construction can legitimately be given to the act.

6. In a suit brought by a shipper against a railroad company for the amount specified in the rule of the railroad commission to be paid to him for failure by the company to furnish cars upon demand, if the carrier shows the existence of conditions for which it is not responsible, preventing the discharge of the duty, it will not be held liable.

(*a*) Questions of admissibility of certain evidence and of the sufficiency of certain particular defenses determined.

August 11, 1910.

The Court of Appeals certified to the Supreme Court the following questions:

1. Does storage rule 9 of the railroad commission of Georgia, adopted under authority of the act of 1905 (Acts 1905, p. 120), commonly known as the Steed act, apply to cars intended to be used for the shipment of freight from a point in this State to a destination in another State; i. e., is the rule applicable to interstate transactions? Said rule is as follows: "Railroad companies

are required to furnish cars promptly upon request therefor. When a shipper files with a railroad company written application for a car or cars, stating therein the character of freight to be shipped, and its destination, such railroad company shall furnish same within four days (Sundays and legal holidays excepted) from seven o'clock a. m. of the day following the receipt of such application. For a violation of this rule the railroad company at fault shall, within thirty days after demand in writing is made therefor, pay to the shipper so offended the sum of one dollar per car per day, or fraction of a day, after expiration of free time, during which such violation continues."

2. Where, prior to August 23, 1907 (the date on which section 3 of the Steed act was repealed), the shipper filed with the railroad commission a complaint setting forth a violation of the said rule 9 referred to in the preceding question, and giving the details of the violation by a named railroad company, was it necessary for the railroad commission to cause formal notice to be served upon the railroad company, requiring it to show cause on a named day, before any lawful order could be passed by the railroad commission upon the complaint? Was a letter addressed by the secretary of the railroad commission to the manager of the railroad company, who handled freight claims and demurrage complaints, enclosing him a copy of the papers filed by the complainant, and adding, "You will please show cause at the earliest practical time, if any you had, why this claim should not be paid," a sufficient notice under said act? If not, did a letter written by this manager to the secretary of the railroad commission, acknowledging receipt of the letter just referred to, and setting up that he had investigated the complaint, and that his investigation had developed that all orders for cars were promptly filled, that no discrimination was practiced in the distribution of cars, that shippers were furnished all the cars which the railroad company had for loading, that he understood that the suit had been brought on the claim, and that he did not suppose that it was worth while for him to undertake to answer the complaint in detail,—operate as a waiver of further notice? Did the foregoing correspondence give the railroad commission jurisdiction of the defendant, so as to authorize the commission on the next day after the receipt of the letter last mentioned, without further hearing, to render a judgment "that sufficient cause had

not been shown to relieve said railroad company of the penalty claimed"?

3. Prior to August 23, 1907, did a judgment or decision of the railroad commission (under section 3 of the act approved August 23, 1905, commonly known as the Steed act) that a railroad company, complained of as having violated said rule 9 of the railroad commission, had not shown sufficient cause to relieve itself of liability, conclude the parties, and especially the railroad company, as to the question of the company's liability to the complainant for the amount of demurrage claimed by the complainant and allowed by the railroad commission?

4. Is said rule 9 of the railroad commission, quoted above, a reasonable rule?

5. In a suit by one who claims to have been damaged by reason of a railroad company's failing to furnish him cars as required by said rule 9, quoted above, and whose claim was presented to the railroad commission under the third section of the Steed act cited above, and was allowed by the commission after a hearing prior to August 23, 1907, is it permissible for the defendant to show by testimony that the rule operated unreasonably as against the railroad company in the particular transaction in controversy? Can the railroad company show, in defense to the suit, that it did not own sufficient cars to comply with the demands made upon its service at the time when the plaintiff ordered the cars of it? Is it relevant to prove that at that time the general movement of freight throughout the country traversed by the defendant's lines of railroads was unusually large and more than was normally to have been anticipated, and that therefore the defendant could not comply with the plaintiff's demand for cars? Is it permissible in such a case for the defendant company to show that at the time when the plaintiff was demanding the cars in controversy its operatives were "on a strike," and that for that reason it was not able to comply with the plaintiff's demand? Would it be a sufficient defense to an action of the nature indicated for the defendant to show that it distributed its cars fairly and proportionately to its patrons throughout the several divisions of its railroad lines, and that it did not have and could not have gotten enough cars to fulfill all demands upon it? If the foregoing question is answered in the affirmative, how would the question be affected if it appeared that

in the distribution of the cars the defendant company had given preference to the traffic paying the highest rate of freight; how far by the fact that it gave preference in the furnishing of cars for the hauling of those classes of commodities which were of greatest value or which would have been damaged the most if delayed?

*McDaniel, Alston & Black,* for plaintiff in error.

*Moore & Pomeroy* and *W. W. Hood,* contra.

LUMPKIN, J.  1. The constitution of the United States (sec. 8, par. 3) declares that Congress shall have power "to regulate commerce with foreign nations, and among the several States, and with the Indian tribes." In the English language few clauses can be found which have had a more far-reaching effect than that comprised in the seven words "to regulate commerce . . . among the several States." If these words have a rival, it is to be found in those other four words in the fourteenth amendment of the same constitution—"due process of law." On the first quoted clause has been built up a vast structure of legislation and litigation, the appearance of which may, with some degree of aptness, be compared to a gigantic, inverted pyramid, with its apex resting on the brief clause mentioned, and its body stretching away into legal space,—its limits or base being yet undefined. First was involved commerce in the sense of traffic between the States; then followed questions as to instrumentalities for carrying on commerce; then in regard to certain things being prepared or manufactured to be put into interstate commerce; then as to other matters and legal relations and liabilities. At each step the police power of the individual States has been contested, and litigants have claimed that it was in part annulled or curtailed either by the constitution or the acts of Congress. We are not contesting the doctrine, which has been declared by the Supreme Court of the United States, that, under the Federal constitution, Congress has plenary power to enact laws on the subject of interstate commerce, and that State laws must yield to those of Congress within the realm of its power on that subject. But it must not be forgotten that the powers of the Federal government are delegated, while those of the individual States are inherent; that the police power of the States has been well compared to the right of self-protection; and that a State without police power would be a State paralyzed. In determining, therefore, how far its inherent police power on a subject of great

importance to its citizens has been superseded, destroyed, or withdrawn under the delegated powers of the Federal government—either by the language of the constitution itself or by the acts of Congress under it—the far-reaching effect upon the State's power to protect its citizens and those within its borders is not to be lightly overlooked. At least, the conflict between the law of the State and the constitution of the United States, or acts of Congress passed in pursuance of it, ought to be clear, before the former is nullified. *Armour & Co.* v. *City Council of Augusta,* 134 *Ga.* 178 (67 S. E. 417). It must also be borne in mind that where it has been held that the constitution of the United States, *proprio vigore,* excluded legislation on the part of the State, it was in cases where it was declared that the subject was one essentially "national" in character; and that in many other cases State legislation has been upheld unless superseded by Federal legislation, although affecting in some measure interstate commerce or its instrumentalities, or corporations engaged in it.

We have dealt with rule 9 of the railroad commission, as applicable to intrastate shipments, in *Southern Railway Co.* v. *Melton,* 133 *Ga.* 277 (65 S. E. 665). The first question in the present case inquires as to its application to cars intended for use in interstate shipments.

In Louisville & Nashville R. v. Kentucky, 161 U. S. 702 (16 Sup. Ct. 714, 40 L. ed. 849), a provision of a State constitution prohibiting consolidation by common carriers was involved. It was held to be a legitimate exercise of the police power of the State. In dealing with the commerce clause of the constitution of the United States as affecting the subject in hand, Mr. Justice Brown, in behalf of the court, said: "It has never been supposed that the dominant power of Congress over interstate commerce took from the States the power of legislation with respect to the instruments of such commerce, so far as the legislation was within its ordinary police powers." In Lake Shore & Mich. South. Ry. v. Ohio, 173 U. S. 285 (19 Sup. Ct. 465, 43 L. ed. 702), the Supreme Court had under consideration a statute of Ohio which required that each railroad company should cause three of its regular daily trains carrying passengers to stop at a station, city, or village containing over 3,000 inhabitants. Mr. Justice Harlan filed an elaborate and able opinion citing and discussing numerous authorities. He said

(p. 297) : "But in our opinion the power, whether called police, governmental, or legislative, exists in each State, by appropriate enactments not forbidden by its own constitution or by the constitution of the United States, to regulate the relative rights and duties of all persons and corporations within its jurisdiction, and therefore to provide for the public convenience and the public good. This power in the States is entirely distinct from any power granted to the general government, although when exercised it may sometimes reach subjects over which national legislation can be constitutionally extended."  Again he said (p. 303) : "We perceive in the legislation of Ohio no basis for the contention that the State has invaded the domain of national authority or impaired any right secured by the national constitution.  .  . It has not unreasonably obstructed the freedom of commerce among the States. , Its regulations apply equally to domestic and interstate railroads.  Its statute is not directed against interstate commerce, but only incidentally affects it."  In Atlantic Coast Line v. Wharton, 207 U. S. 328, 334 (28 Sup. Ct. 121, 52 L. ed. 230), the ruling in the case last mentioned was recognized as sound; but it was held that the order of the State railroad commission then being considered directly and unreasonably burdened interstate commerce.  In Western Union Tel. Co. v. James, 162 U. S. 650 (16 Sup. Ct. 934, 40 L. ed. 1105), the question was whether a State statute requiring telegraph companies with lines of wires wholly or partly within the State to receive telegrams, and on payment of the charges thereon to deliver them with due diligence, was a regulation of interstate commerce when applied to interstate telegrams.  It was held that such an enactment did not in any just sense regulate interstate commerce.  It was said: "While it is vitally important that commerce between the States should be unembarrassed by vexatious State regulations regarding it, yet on the other hand there are many occasions where the police power of the State can be properly exercised to insure a faithful and prompt performance of duty within the limits of the State upon the part of those who are engaged in interstate commerce.  We think the statute in question is one of that class, and, in the absence of any legislation by Congress, the statute is a valid exercise of the power of the State over the subject."  We need not discuss subsequent congressional enactments in regard to telegraph companies.  The principle remains the

same, whether State legislation in the particular instance has been superseded by congressional legislation or not. In County of Mobile *v.* Kimball, 102 U. S. 691 (26 L. ed. 238), an act of the State of Alabama, entitled "An act to provide for the improvement of the river, bay, and harbor of Mobile," was held not to be in conflict with the constitution of the United States. Mr. Justice Field said (p. 702) : "Perhaps, some of the divergence of views upon this question among former judges may have arisen from not always bearing in mind the distinction between commerce as strictly defined, and its local aids or instruments, or measures taken for its improvement." So State laws regulating pilots have been declared to be valid. Cooley *v.* Board of Wardens, etc., 12 How. 319 (13 L. ed. 996). So also certain State laws in reference to bridges over navigable streams have been upheld. Willson *v.* Blackbird Creek Marsh Co., 2 Peters, 245, 252 (7 L. ed. 412) ; Gilman *v.* Philadelphia, 70 U. S. 713 (18 L. ed. 96). Other instances might be mentioned, some of which will be found referred to in the cases above cited. It will thus appear that it is a mistaken conception to suppose that wherever a railroad engages in interstate shipments, the constitution of the United States by its own force in all respects inhibits the police power of the State from dealing with such railroad. As to matters relating to interstate commerce which essentially and exclusively appertain to, the Federal government the power of the States to directly regulate them may be inhibited; but there is a large class of subjects which may be dealt with under the police power of the individual States, although its exercise may touch instrumentalities of interstate commerce, and indirectly to some extent affect such commerce. No catalogue can be made setting forth exactly what falls within the one class or the other. But the fact that a distinction between the two exists is well established.

In regard to the subject of statutes or rules of railroad or corporation commissions of States, requiring the furnishing of cars, and providing for a penalty or amount which may be recovered for failure to so furnish them in accordance with the requirements made, and the application of such enactments or rules to cases where cars are desired for use in interstate shipments, the decisions are not many, but they vary widely in the views which they express. They may be grouped about the case of Houston and Texas Central

Railroad Co. *v.* Mayes, 201 U. S. 321 (26 Sup. Ct. 491, 50 L. ed. 772). A statute of the State of Texas provided, that, upon written application, it should be the duty of a railroad company to supply the number of cars required, at the point indicated in the application, within a reasonable time thereafter, not to exceed six days from the receipt of such application; and that if the railroad company should fail to furnish such cars, it should forfeit to the party so applying the sum of "twenty-five dollars per day for each car failed to be furnished," and all actual damages sustained, provided "that the provisions of this law shall not apply in cases of strikes or other public calamity." Other provisions of the act are immaterial here. The Court of Civil Appeals of Texas held that this law was a proper exercise of the police power of the State as applied to interstate shipments, and was valid. Houston and Texas Central R. Co. *v.* Mayes, 36 Tex. Civ. App. 606 (83 S. W. 53). An application for a writ of error to the Supreme Court of the State was overruled, and the case was carried to the Supreme Court of the United States. There it was held (201 U. S. 321, supra) that "An absolute requirement that a railroad engaged in interstate commerce shall furnish a certain number of cars on a specified day, to transport merchandise to another State, regardless of every other consideration except strikes and other public calamities, transcends the police power of the States and amounts to a burden upon interstate commerce. . . Such a regulation can not be sustained as to interstate commerce shipments as an exercise of the police power of the State." In the opinion, after referring to the power of Congress to regulate interstate commerce, it was said (p. 328): "That, notwithstanding the exclusive nature of this power, the States may, in the exercise of their police power, make reasonable rules with regard to the methods of carrying on interstate business, the precautions that shall be used to avoid danger, the facilities for the comfort of passengers and the safety of freight carried, and, to a certain extent, the stations at which stoppages shall be made, is settled by repeated decisions of this court. Of course, such rules are inoperative if conflicting with regulations upon the same subject enacted by Congress, and can be supported only when consistent with the general requirement that interstate commerce shall be free and unobstructed, and not amounting to a regulation of such commerce. As the power to build and operate

railways, and to acquire land by condemnation, usually rests upon
State authority, the legislatures may annex such conditions as they
please with regard to *intra*state transportation and such other rules
regarding *inter*state commerce as are not inconsistent with the gen-
eral right of such commerce to be free and unobstructed." Again
it was said, referring to the Texas statute (p. 329), "It makes no
exception in cases of a sudden congestion of traffic, and actual in-
ability to furnish cars by reason of their temporary and unavoidable
detention in other States, or in other places within the same State.
It makes no allowance for interference of traffic occasioned by
wrecks or other accidents upon the same or other roads, involving
a detention of traffic, the breaking of bridges, accidental fires, wash-
outs or other unavoidable consequences of heavy weather. The
dereliction of a road in this particular, which may have occurred
from circumstances wholly beyond the control of its officers, is made
punishable not only by damages actually incurred by the shipper
in the detention of his stock, but in addition thereto by an arbi-
trary penalty of $25 per car for each day of detention." Finally
it was said (p. 331) : "While railroad companies may be bound to
furnish sufficient cars for their usual and ordinary traffic, cases
will inevitably arise where by reason of an unexpected turn in the
market, a great public gathering, or an unforeseen rush of travel,
a pressure upon the road for transportation facilities may arise,
which good management and a desire to fulfill all its legal require-
ments can not provide for, and against which the statute in question
makes no allowance. Although it may be admitted that the statute
is not far from the line of proper police regulation, we think that
sufficient allowance is not made for the practical difficulties in the
administration of the law, and that, as applied to interstate com-
merce, it transcends the legitimate powers of the legislature."
The Chief Justice, Mr. Justice Harlan, and Mr. Justice McKenna
dissented, evidently believing that the statute was valid. Mr.
Justice White did not take part in the decision.

In St. Louis Southwestern Ry. Co. *v.* State, 85 Ark. 311 (107 S.
W. 1180, 122 Am. St. R. 33), certain sections of the digest of that
State and an order of the railroad commission were under con-
sideration. By the statutes of that State carriers were required to
"receive, load, unload, transport, store, and deliver to the consignee
thereof all property tendered for shipment," and to furnish cars

for shipments; and a violation of these requirements was declared to furnish a cause of action in favor of the shipper. Power was conferred upon the commission to make rules on the subject. They made a rule providing that, upon application by the shipper, giving not less than five days notice, cars should be furnished. The Supreme Court of Arkansas held that the statutes were valid as applied to interstate shipments, and that the defense set up to an action to recover the penalty was insufficient. The case was carried to the Supreme Court of the United States, where it was decided April 4, 1910. 217 U. S. 136 (30 Sup. Ct. 476, 54 L. ed. ——). After an analysis of the decision of the Supreme Court of Arkansas, and of its effect in excluding the defense offered in relation to interstate shipments, Mr. Justice White declared that, as thus construed, the law of that State excluded a certain defense, and operated to unlawfully burden interstate commerce. He said: "Coming to the merits, we think it needs but statement to demonstrate that the ruling of the court below involved necessarily the assertion of power in the State to absolutely forbid the efficacious carrying on of interstate commerce, or, what is equivalent thereto, to cause the right to efficiently conduct such commerce to depend upon the willingness of the company to be subjected to enormous pecuniary penalties as a condition of the exercise of the right. . . . If it be that the court below was right in its assumption that the rules of the American Railway Association, governing, as was conceded by the court, ninety per cent. of the railroads and hence a vast proportion of the interstate commerce of the country, are inefficient to secure just dealing as to cars moved by the carriers engaged in interstate commerce, that fact affords no ground for conceding that such subject was within the final cognizance of the court below and could by it be made the basis of prohibiting interstate commerce or unlawfully burdening the right to carry it on."

We have quoted at some length from these two recent decisions of the Supreme Court of the United States, in order to show that in neither of them was it declared that a State legislature, or a railroad commission under its authority, could not make a rule requiring cars to be furnished within a reasonable time, although they were to be used for interstate shipments, unless such rule or act excluded legitimate defenses. To say that all of the discussion in the Mayes case, which has been set out above, meant merely to

declare that the States could not make such rules, regardless of the defenses permissible in suits brought thereunder; would be to attribute to that high court the employment of a large amount of needless circumlocution, and the basing of its opinion upon the illegal restriction of defenses made by the Texas statute, when in fact the extent of the defenses allowed thereby had nothing to do with the case. We can not suppose this to be the fact in regard to a decision of that great court. And while the decision in the case of St. Louis Southwestern Ry. Co. did not refer to the Mayes case or deal as specifically with the limitation of defenses under the State statute, the analysis of the decision of the State court and the conclusion drawn therefrom apparently proceed on the ground of the exclusion of a lawful defense, and not upon the ground that the State could enact no such law in any event. Nor do we think that this petition is altered by the last sentence in the opinion, which reads as follows: "In the nature of things, as the rules and regulations of the association concern matters of interstate commerce inherently within Federal control, the power to determine their sufficiently we think was primarily vested in the body upon whom Congress has conferred authority in that regard."

As already indicated, the line of demarkation between the authority of Congress and that of State legislatures is not one which has been defined with mathematical exactness. It has rather been determined as a concrete question on which side of the line a particular case fell. As the Supreme Court of the United States have mentioned reasonableness as a guide in determining the extent to which a State law may affect interstate shipments without being invalid, and as reasonableness or unreasonableness is a matter for which no absolute standard can be prescribed, but a thing sometimes appears reasonable to one mind, yet unreasonable to another, and even the same person may change his view as to what is reasonable with age, experience, and reflection, the determination of questions like that now before us involves no small difficulty. We believe, however, that the effect of the rulings above mentioned is that the States are not absolutely precluded from making rules of the character of that here involved, either as to cars to be used in intrastate shipments, or those to be used in interstate shipments; but that the exclusion of proper defenses as to cars to be used in interstate shipments would render the act or rule ineffectual as to

that class of business. As to intrastate shipments, the interstate law would have no application; but as to them the question would remain whether the act or rule was in conflict with the clause of the constitutions, State and Federal, guaranteeing due process of law.

After the decision in the Mayes case, the Court of Civil Appeals of Texas held that the sections of the revised statutes of that State imposing a penalty on carriers for delay in furnishing cars for shipments were invalid under the Federal constitution, as an interference with interstate commerce. Texas & Pacific Ry. Co. v. Allen, 42 Tex. Civ. App. 331 (98 S. W. 450). That court treated the State statutes as applying to interstate shipments, and as excluding all defenses save those enumerated. In Kansas the statute on the subject was very similar to that of Texas, except that where the Texas statute provided that it should not apply "in cases of strikes, or other public calamity," the Kansas statute permitted no excuse to be set up except "strikes, unavoidable accidents, and other public calamities." The Supreme Court of the latter State distinguished the two statutes on the ground that the Texas law provided the heavy penalty of $25 per car per day, while that imposed by the Kansas statute was $1 for each car per day, which was reasonable and the same amount as was allowed as demurrage to the railroad companies for a failure on the part of shippers to promptly unload cars; and also on the ground that the addition in the Kansas law, of the words "unavoidable accidents," to the excuses allowed by the Texas statute made a material difference. It was said: "If, therefore, as said in the opinion in the Mayes case, the Texas statute 'is not far from the line of proper police regulation,' we are justified in concluding that the car-service act of 1905 in question is well within that line."

In Virginia the corporation commission, in pursuance of an act of the legislature, made a rule that when a shipper should make verbal or written application to a railroad company for a car or cars, the company should furnish the same within four days; and that for a failure to comply with this rule the company so offending should forfeit and pay to the shipper $1 per car per day. In Atlantic Coast Line R. Co. v. Commonwealth, 102 Va. 599 (46 Atl. 911), it was held that the State could make valid enactments, in the exercise of its police power, to promote the welfare and convenience of its citizens, though such laws, in their operation, might

incidentally interfere with interstate and foreign commerce; and that the rule of the corporation commission was not void because in its operation it affected incidentally interstate and foreign commerce. It was further said that the validity of the rules prescribed by the commission, so far as they in their operation might unlawfully interfere with interstate and foreign commerce or deprive transportation companies of their property without due process of law, might be determined in any particular case in which the question should be raised. After the decision of the Mayes case, it was held by the Supreme Court of Appeals of Virginia that the rule was unreasonable and void as applied to shipments to points outside the State. Southern Railway Co. v. Commonwealth, 107 Va. 771 (60 S. E. 70, 17 L. R. A. (N. S.) 364). No change in the former decision as to the reasonableness of the rule in regard to intrastate business was made; but the severe arraignment of the rule of the commission and its operation, contained in the opinion of Cardwell, J., would seemingly point to the result that as to any class of business it was contrary to the provision of the constitution in regard to due process of law. Two of the judges, in concurring specially, said: "Their reasoning, if followed to its logical result, as we understand it, would not only render the rule in question invalid, but would make it impossible for the State corporation commission to make any valid rule on the subject."

In North Carolina an act was passed requiring a railroad company to pay a penalty for a failure to ship goods promptly. In Branch v. Wilmington etc. R. Co., 77 N. C. 347, the act was held to be valid. It was said: "That the regulation in question is within the scope of the police power of the State seems clear to us. . . The legislature considered the common-law liability as insufficient to compel the performance of the public duty. . . The penalty in the case provided for is superadded. The act merely enforces an admitted duty." Similar statutes have several times been before the Supreme Court of North Carolina. Section 2631 of the Revisal of 1905 of that State provides that transportation companies "whose duty it is to receive freight for shipment" shall, for refusing to receive all freight, "whenever tendered" to its agent, etc., forfeit and pay a penalty of $50 for each day it refuses to receive said freight, together with actual damages sustained. The validity of this statute came before the court in Garri-

son *v.* Southern Ry. Co., 150 N. C. 575 (64 S. E. 578). It was held that "when a carrier shows the existence of conditions for which it is not responsible, preventing or rendering impossible the discharge of the duty, it will not be liable for the penalty. . . The court will not attribute to the legislature the intention to punish the failure to do an impossible thing." It was held that the statute which imposed a penalty for a carrier's refusal to receive freight for shipment, as applied to a shipment between points within the State, was valid, and that as applied to shipments, to other States, · in the absence of specific action by Congress or the interstate commerce commission, it was not invalid as a regulation of interstate commerce, though it might indirectly affect interstate commerce. In the opinion, referring to the application of the rule to interstate as well as intrastate shipments, it was said (p. 592) : "We do not think that, in the light of the authorities, it is material whether the shipment is interstate or, as in this case, intrastate." See also Michigan Central R. Co. *v.* Burrows, 33 Mich. 6; Houston etc. Ry. Co. *v.* Campbell, 91 Tex. 551 (45 S. W. 2, 43 L. R. A. 225, and note). In the present case it was said by counsel that there was no common-law duty to furnish cars. Of course, at the time of the separation of this country from England, there were no railroads and no cars. But, even without a statute, such duty has been held to exist in this country. 4 Elliott on Railroads, § 1470. This will be dealt with more fully later.

While some of the reasoning of the Supreme Court of North Carolina, and the references made to certain statutes, may not be entirely applicable to the statutory law of this State, we think that the general conclusion arrived at is sound. We apprehend that some of the courts, in the effort to escape from collision with the Scylla of the interstate commerce laws, are in danger of rushing into the Charybdis of violating the constitutional provision in regard to due process of law.

The act of this State of August 23, 1905 (Acts 1905, p. 120) does not in terms provide how the shipper is to obtain payment of the "forfeitures or penalties" prescribed in the second section thereof. This being so, impliedly he must resort to the courts and bring suit therefor. Did the legislature intend that the amount fixed by the rule of the railroad commission adopted under authority of the act should be absolutely recoverable, and that in a

suit therefor no possible defense should be available? Suppose, for instance, that before the cars arrived at the place where they were to be furnished, an earthquake, a cloudburst, or other similar convulsion of nature should wreck the track and destroy the cars, did the legislature intend that the company should nevertheless be compelled to pay the forfeiture or penalty, though entirely without fault? Suppose that there should be a hostile invasion of the State, or such an insurrection as to require the declaration of martial law, and that the cars and track of the railroad company should be destroyed, or the company should be prevented by armed force from furnishing the cars at the time required, did the legislature mean that the company should nevertheless be held liable under this act and the rule passed in pursuance of it? We can not think so without attributing to a co-ordinate branch of the government an unreasonable and unconstitutional intent. If the act and rule were so construed, and the carrier was allowed no opportunity for exculpation, there could be little doubt of its unconstitutionality. We hold that it does not do so. The difference between this act and the Texas statute was suggested in *Southern Railway Company* v. *Melton*, 133 *Ga.* 277, 298 (65 S. E. 665). Certain language from the opinion of the majority of the court in that case was cited by counsel for the railroad company in the present case, in support of the contention that the rule of the railroad commission under consideration was a regulation of commerce, and, as applied to cars to be used in transporting freight to another State, it would be a regulation of interstate commerce. We do not think that such an interpretation of the language employed in that opinion is correct. The main point then discussed was whether the act of 1905, which authorized the making of the rule of the commission, was an unconstitutional delegation of legislative power. In the opinion of the majority of the court (the Chief Justice dissenting) the writer endeavored to show that the legislature could constitutionally authorize the railroad commission to make the rule. What was said on that subject must be considered in the light of the point then under consideration. It was not held, nor do we now hold, that the act of 1905 or the rule of the railroad commission constituted a regulation of interstate commerce in any such sense as to be obnoxious to the constitution of the United States, or to acts of Congress authorized thereby. Nor do we think that

Congress has specifically dealt with the matter covered by the act of the legislature and the rule of the commission, so as to render them ineffective in respect to cars to be used in shipping goods to another State. In our opinion neither the provision in section three of the act of Congress, entitled "An act to regulate commerce," which declares it to be unlawful for any common carrier subject to the provisions of the act "to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, or locality, or any particular description of traffic, in any respect whatsoever," etc., nor section 23, which authorizes the circuit and district courts of the United States to issue writs of mandamus in certain cases, is such a specific dealing with the matter covered by the act of 1905 and rule nine of the railroad commission as to render them invalid in respect to applications for cars intended to be used in shipments to points beyond the limits of the State. Mandamus is a remedy which does not exclude other statutory rights to sue for penalties or common-law rights to sue for damages. We have not had brought to our attention any act of Congress of such a character as to exclude the exercise of the police power of the State.

From the foregoing discussion it follows, that storage rule No. 9 of the railroad commission of this State, adopted under authority of the act of 1905, applies to applications for cars intended to be used for the shipment of freight between points within the State, and also to applications for cars intended to be used for the shipment of freight from a point in this State to a destination in another State; that the act and rule, correctly construed, are not invalid as an unlawful interference with interstate commerce; but that in a suit by a shipper, based thereon, the railroad company may plead and prove sufficient excusing cause for non-compliance.

2-3. It must be admitted that there is some doubt as to the exact meaning of the third section of the act of 1905. By the second section the legislature provided, that, in order to require cars to be furnished, there must be a written application, and that the railroad commission should, by reasonable rules, provide the time within which a car or cars should be furnished "and the penalty per day per car" recoverable by the shipper for a failure on the part of the company to furnish them. In that section such amounts were also referred to as "forfeitures or penalties." The third sec-

tion declared that before any railroad company "is subjected to the penalties provided by this act" the railroad commission "shall require it to show cause therefor; and if sufficient cause is shown, then the company shall be relieved from any further liability under this act." Next followed section four, which prescribed a public penalty of not exceeding $250, for a violation of any of the rules, orders, or regulations of the commission, to be recovered by suit in accordance with existing laws on the subject. The third and fourth sections have been eliminated by amendment. But they were not repealed in time to relieve the courts from the task of dealing with section three in this case. It is not quite clear why, before a railroad company should be subjected to penalties, it should be required to show cause "therefor;" nor what was meant by relieving it from "further liability under this act." If the third section had followed the fourth, it might with much reason have been construed as applying only to the public penalties dealt with in the latter section. But wedged, as it is, between sections two and four, it may have been intended to operate in both directions. It could not have been the legislative purpose to provide for the obtaining by a shipper of a conclusive judgment against a railroad company, before the commission. That body could not, like a court, render conclusive money judgments between parties. The shipper would have to go to the court finally and seek to recover by suit. The section did not in terms provide for any notice to the shipper or for any hearing on his part. It declared that "if sufficient cause is shown," the company "shall be relieved from any further liability under this act;" but it said nothing as to what would happen if sufficient cause were not shown. It would seem that the shipper could then go ahead and sue. Treating the third section as relating to both the second and fourth, it apparently provided for a hearing of the company's reasons, ex gratia, a species of breakwater, or, as it might be termed, break-suit, interposed between the railroad company and an unwarranted action in court. The act provided for certain penalties or forfeitures. Suit would have to be brought for their recovery. The statutory right to sue was coupled with a statutory requirement or condition. Section three provided for a preliminary step to be taken before any such suit should be brought, namely, that the railroad commission should afford to the railroad company an opportunity to present its excuses or causes;

and if that body deemed them sufficient, the company was relieved from "any further liability" under this act. In that event no suit could be brought; otherwise suit could be instituted. But if it were brought, the courts, not the railroad commission, must determine the sufficiency of the defenses or excuses set up. The preliminary investigation by the railroad commission was not a judicial inquiry in any such sense as to make their finding conclusive on the company in a suit against it. This may be a somewhat unusual provision to prevent useless, unfounded, and harrassing suits against the carrier. But in some of the States it has been provided that the railroad or corporation commission may suspend the operation of a rule at any time; Congress made the findings of the interstate railroad commission prima facie evidence; and one or more States have made a similar provision as to the prima facie effect of findings of their commissions. If there is a legitimate choice between constructions of an act, one of which would render it constitutional, and the other unconstitutional, the former will be preferred. Holding, as we do, that the hearing provided before the railroad commission was of the character indicated, and not a conclusive adjudication of liability on the part of the company, the letter of the secretary of the railroad commission (which we infer was sent by authority) and the reply of the agent of the company, mentioned in the second question of the Court of Appeals, authorized the commission to declare that the company had not shown sufficient cause to relieve itself, so as to prevent a suit.

4. From what has been said above, it will appear that rule 9 of the railroad commission, properly construed in connection with the act of 1905, is reasonable.

5. The fifth division of the questions propounded includes several questions, some of which can not be readily answered categorically, because, taken separately, each does not cover the whole field in regard to the subject mentioned. It may be said generally, that, in a suit by a shipper or consignor to recover from a railroad company the amounts provided by rule 9 of the railroad commission, the defenses held to be proper by the Supreme Court of the United States in Houston & Texas Central R. Co. v. Mayes, 201 U. S. supra, and St. Louis Southwestern Ry. Co. v. State, supra, are open to the company as excuses for non-compliance with the rule; and evidence is admissible to sustain such defenses. The reason-

ableness of the rule of the commission is a question of law for the court, not of fact for the jury. As construed by us, we have held it to be reasonable.

It is the duty of a railroad company as a common carrier to provide cars sufficient to transport goods offered in the usual and ordinary course of business; but it is not bound to anticipate and prepare for an exceptional and extraordinary press of business. 4 Elliott on Railroads, § 1470 (supra); 5 Am. & Eng. Enc. Law. (2d ed.) 167, 168; Michigan Central R. Co. *v.* Burrows, 33 Mich. supra. Merely to show that a railroad did not have enough cars to comply with the demands made upon its services, at the time when cars were ordered from it, would not alone suffice. It may have been negligent in providing for the ordinary conduct of its business; and its own negligence would be no defense to it. But if it complied with its duty in this respect, evidence of a want of cars may be admissible, as tending to show that the company was not at fault. If it complied with its duty in regard to providing facilities for the transportation of goods, it would be relevant to prove that, at the time of the demand, the general movement of freight throughout the country traversed by the defendant's lines of railroads was unusually large and more than was normally to have been expected, and that therefore it could not comply with the demand for cars, without fault on its part.

Mere proof that there is a strike of hands on a railroad, without more, does not furnish a defense for failure to discharge its duty as a common carrier. Strikes may include only an insignificant number of employees, or those engaged in some department of the work which in no substantial way interferes with the furnishing of cars; or, upon the happening of a strike; the company may, without sufficient effort or reason, cease or fail to conduct its business. The word "strike" does not necessarily describe the entire situation. But if a strike of operatives on a railroad is of such magnitude and character, and under such conditions, as to render the company unable, by the use of proper efforts, to furnish cars on demand, it will be a good defense to a suit under rule 9 of the railroad commission. There is some difference between what will excuse the failure of a common carrier to deliver goods received by it for transportation, and what may excuse delay in furnishing cars. Evidence on the subject just mentioned is admissible.

One of the questions propounded by the Court of Appeals was as follows : "Would it be a sufficient defense to an action of the nature indicated for the defendant to show that it distributed its cars fairly and proportionately to its patrons throughout the several divisions of its railroad lines, and that it did·not have and could not have gotten enough cars to .fulfill all demands upon it?" We an-- swer this question in the affirmative, if the railroad company has complied with its duty as to providing sufficient cars for the conduct of its business.   This does not mean that a railroad company can arbitrarily scatter its cars over its line, and refuse to furnish cars to a shipper on application, at its mere will.   Nor does it mean that a failure in duty to supply itself with cars sufficient for the transaction of its ordinary business, naturally to be expected, can be excused merely by showing that it has scattered insufficient equipments at different points along its track.

The. company could not legitimately give preference to traffic paying the highest rate of freight.   To hold that it could would be to say that discrimination might be made for extra compensation.   Nor would the mere fact that certain classes of commodities were more valuable than others authorize a preference in shipment to be. made in favor of the former.   Where there is a press of. business, perishable goods, or goods the inherent character of which is such as to render them peculiarly liable to serious injury from delay, and which must be transported promptly or else lost or greatly damaged, have been considered as of such exceptional character as to authorize a reasonable preference, as to expedition in hauling them, over freight not of such a character, in the absence of express statutory regulation on the subject.   5 Am. & Eng. Enc. Law· (2d ed.) 253 ; Peet *v.* Chicago etc. Ry. Co., 20 Wis. 294 (91 Am. D. 446) ; Tierney *v.* New York Central &c. R. Co., 76 N. Y. 305.   This does not, however, authorize preferences on account of mere slight differences  in commodities; nor can the rule be invoked as a cloak for making illegal. dscriminations in favor of one shipper or class of shippers as against another, without real ground for .its application.   *Ocean Steamship Co.* v. *Savannah Supply Co.,* 131 *Ga.* 831, 839 (63 S. E. 577, 20 L. R. A. (N. S.) 867, 127 Am. St. R. 265).

We think what has been said answers all of the questions propounded.

*All the Justices concur, except Beck, J., absent.*