Ed L. POWERS, d/b/a Ed L. Powers Contracting Co., and American Employers Insurance Company, Appellants,

v.

Alex L. GILMOUR, Jr., trading and doing business as Alex L. Gilmour and Son, and United States Fidelity & Guaranty Company, Appellees.

No. 19014.

United States Court of Appeals
Fifth Circuit.

Dec. 13, 1961.

Ronald F. Adams, Jesup, Ga., Harry S. McCowen, Atlanta, Ga., for appellants.

Chas. L. Gowen, Brunswick, Ga., Charles Cook Howell, Charles Cook Howell, Jr., Jacksonville, Fla., for appellees. Howell, Kirby, Montgomery & Sands, Jacksonville, Fla., Gowen, Conyers, Fendig & Dickey, Brunswick, Ga., of counsel.

Before BROWN, GEWIN and BELL, Circuit Judges.

GRIFFIN B. BELL, Circuit Judge.

Appellant Powers and his surety, American Employers Insurance Company complain of a jury verdict and judgment rendered thereon in the District Court in favor of Appellee, Gilmour, plaintiff

in the court below, and his surety, United States Fidelity and Guaranty Company, third party defendant there. Gilmour, as a subcontractor brought suit against Powers, the general contractor and his surety alleging the breach of a written subcontract. Powers had undertaken the construction of an addition to the Brunswick, Georgia hospital and Gilmour subcontracted with Powers to do the heating, plumbing and air conditioning work. Powers filed a counterclaim against Gilmour, and the third party defendant. The trial court by pretrial order limited the issues after the parties stipulated the amounts to be recovered depending on who should prevail so that the only issue left in the case for trial was whether the subcontract was breached by Powers or Gilmour.

The employees of Gilmour were members of a union and this was known to Powers at the time the subcontract was executed, while Gilmour knew at the time that Powers employed both union and non-union labor. Gilmour began performance under the subcontract in July, 1956. On August 1, 1956, a picket line was placed around the job site and the employees of Gilmour refused to cross it. It is undisputed, indeed stipulated, that neither Gilmour nor any of his employees had any part in or any connection with the picket line or the grievance which produced it, and that its creation and maintenance was wholly the work of labor union members who employed the picket line pursuant to their grievance against Powers for employing non-union labor.

On or about September 1, 1956, Powers obtained a temporary injunction in the state court enjoining the picketing and Gilmour's men immediately returned to work and stayed on the job progressing the work under the subcontract until the injunction was dissolved on November 2, 1956. The picket line was then reinstated and again Gilmour's men refused to cross it. Powers appealed from the order dissolving the injunction and in January, 1957 the Supreme Court of Georgia reversed the lower court holding that the picketing was illegal. Powers v. Courson, 213 Ga. 20, 21, 96 S.E.2d 577 (1957). The basis of the ruling, in addition to the admitted purpose of the picketing, was the refusal of union members employed on the job to cross the picket line.

The picketing continued from November 2, 1956 to the effective date of the judgment of the Georgia Supreme Court in January, 1957. The testimony was that pending the court decision Gilmour attempted to get his men back to work through contact with union officials, and that he also attempted to employ other workmen to progress the contract.

Prior to the judgment of the Supreme Court of Georgia, and despite his contention before that court of the illegality of the picket line that the dispute was between him and the union and that the picket line was causing union members such as those employed by Gilmour to refuse to cross it, Powers by counsel and through the medium of a letter dated December 6, 1956 terminated the subcontract with Gilmour. The notice of termination in pertinent part is as follows:

> "On behalf of Ed L. Powers Contracting Company, this is to notify you, that inasmuch as you have failed to diligently prosecute the work described and agreed upon in your contract dated May 7, 1956, Ed L. Powers Contracting Company will, in accordance with Article 1(a) and Article XIII of said contract, relet the same at the best terms obtainable by negotiation."

Article XIII set out the method of termination. Article 1(a) of the contract on which Powers relied as the reason for terminating the contract is as follows:

> "If, by reason of strikes, picketing or disputes of any nature between the sub-contractor and any individual, group or organization, this sub-contractor should be persistently, repeatedly, or for a period of fourteen (14) consecutive days, un-

able to supply enough properly skilled workmen or proper materials to execute the work defined in this contract, then the contractor may proceed as outlined in Article XIII of this Contract."

It was undisputed that Powers added this provision to the printed subcontract supplied by him. It was the position of Powers that the meaning of this provision was such as to make it operative in his favor in the event of picketing arising out of a dispute between Powers and others notwithstanding that Gilmour was in no way involved. Gilmour took the position and so testified that his understanding of this provision at the time the subcontract was executed was that it made him responsible in the event of a strike, picketing or dispute between him and other parties.

During the trial of the case counsel for Appellants stated to the court that it was through no fault of Gilmour that the picket line was established and maintained, and that the question before the court was whether the failure of the workmen of Gilmour to cross the picket line constituted a legal excuse for his failure to perform under the subcontract.

■ Appellants assign as error the insufficiency of the evidence but made no motion for a directed verdict. While there appears to be no basis in fact for this contention, suffice it to say that the question may not now be raised. Stokes v. Continental Assurance Company, 242 F.2d 893, 894 (5 Cir., 1957).

All of the other errors assigned fall into two categories: first, whether the provision contained in Article 1(a) of the subcontract binds Gilmour where the picket line arose out of a dispute wholly between Powers and others; and second, whether under the contract and as a matter of law Gilmour could be relieved of going forward under the contract if the labor dispute was such as to render

him unable to furnish labor by the use of proper efforts.

The substance of the second category is that even if the disputed language in the contract is resolved in favor of Gilmour, nevertheless, Gilmour assumed the risk and was bound to perform under the contract nothwithstanding the labor dispute and resulting picket line may have rendered him unable to perform.

■■ The District Court in view of the undisputed facts could have resolved the meaning of the provision contained in Article 1(a) of the contract in favor of Gilmour as a matter of law.[1] Ga.Code, Section 20–701; Bozarth v. Paschall, 1924, 158 Ga. 208, 209, 122 S.E. 683. Powers by inserting this language made Gilmour responsible for strikes, picketing or disputes between Gilmour, the subcontractor, and others. Here the dispute, and resultant picketing was between Powers and others. At any rate, the same result was obtained by submitting the meaning of the language to the jury as an ambiguity since the jury resolved its meaning in favor of Gilmour.

Powers next asserts that Gilmour assumed the risk of going forward with the contract, and that the refusal of his employees to cross the picket line did not constitute a legal excuse for failure to go forward and therefore Powers was justified in removing Gilmour from the job. The court did charge the jury that mere proof of a strike between Powers and certain labor unions caused by the employing of nonunion workers on the job by Powers did not furnish a defense for failure of Gilmour to discharge his duty as a subcontractor, but added that if the strike [picketing] was of such magnitude and character and under such conditions as to render Gilmour unable by the use of proper efforts to furnish labor on demand, it would be a good defense.

This principle of law was taken from the case of Southern Railway Company v.

1. This being so, it is unnecessary to consider the alleged error in the admission of testimony of Gilmour as to his intention regarding the meaning of this provision.

Atlanta Sand and Supply Company, 135 Ga. 35, 68 S.E. 807 (1910) wherein the Supreme Court of Georgia answered a certified question from the Georgia Court of Appeals involving whether or not a carrier should pay a penalty for failure to furnish cars promptly when requested under a rule of the Georgia Railroad Commission, when the defense of the railroad was that its employees were on strike. The Georgia Supreme Court laid down the following rule in answer:

> "Mere proof that there is a strike of hands on a railroad, without more, does not furnish a defense for failure to discharge its duty as a common carrier. * * * But if a strike of operatives on a railroad is of such magnitude and character, and under such conditions, as to render the company unable, by the use of proper efforts, to furnish cars on demand, it will be a good defense to a suit under rule 9 of the Railroad Commission."

The propriety of this charge must be determined by Georgia law. City of Albertville, Alabama v. United States Fidelity and Guaranty Company, 272 F.2d 594 (5 Cir., 1959). It was adjusted to the evidence especially in view of the fact that Gilmour not only was an innocent victim of a dispute between Powers and others, but where the contract itself fairly construed contemplated exoneration of Powers and Gilmour from claims arising by reason of delays caused by labor disputes, except under Article 1(a) when Gilmour was a party to the dispute. Article 1(a) and III(c).[2]

What the court in effect correctly charged the jury was that Gilmour was not relieved merely by the existence of the picket line, but that under the contract he did not assume the risk of going forward if he was unable to do so through the use of proper efforts.

2. Article III(c):
"Contractor shall not be liable to the Sub-contractor for delay to Sub-contractor's work by the act, neglect or default of the Owner, or the Architect, or by reason of fire or other casualty, or on account of riots, or of strikes, or other combined action of the workmen or oth-

Appellants urge that the question is controlled by the case of Fritz-Rumer-Cooke Co. v. United States, 279 F.2d 200 (6 Cir., 1960), and the principle set out therein. There the work was delayed by a strike and the government excused the delay by granting the contractor an extension of time. The contractor, not being satisfied with this relief, sued for damages sustained from the interruption of the work. The contract did not afford a basis for such a suit. No question of damages sustained by Gilmour because of delay is here involved; only damages for breach of the subcontract whereunder he was put off the job. This case, not being in point factually and not setting out a principle of law applicable to the Georgia contract under consideration, is not controlling.

No harmful errors appearing and the jury having resolved the issues that remained after the pretrial order in favor of appellees; the judgment of the District Court is

Affirmed.

ers, or on account of any acts of God, or any other cause, beyond Contractor's control, or on account of any circumstances caused or contributed to by the Sub-contractor; but Contractor will cooperate with Sub-contractor to enforce any just claim against Owner or Architect for delay."