OCEAN STEAMSHIP COMPANY OF SAVANNAH *v.* SA-
VANNAH LOCOMOTIVE WORKS AND SUPPLY CO.

1. The common-law obligation of a carrier by sea is to receive goods which
   it is able and accustomed to carry, in the order of their tender, without
   preference to any shipper.
2. At common law a carrier's duty to carry was limited to its facilities
   for transportation. A navigation company, whose charter confers no
   power of eminent domain, nor imposes any public duties, is not to be
   classed as a public or quasi-public institution, and is not bound to pro-
   vide sufficient facilities to carry all goods which may be offered to it.
   It may decline to receive goods for transportation in excess of its car-
   riage capacity.
3. A carrier, not a public institution, may select the character of the
   goods it proposes to carry, or discontinue to carry a particular com-
   modity.
4. A common carrier by sea can not lawfully reject some goods which it
   professes to carry, and afterwards receive and transport other goods,
   where at the time of the tender there is room in the vessel for the re-
   jected goods, and the safety of the vessel will in no wise be imperiled.
5. The carrier's common-law obligation of indifferently serving the pub-
   lic in the receipt and transportation of goods does not inhibit a carrier
   by sea from making "bookings" of freight,—that is, from making spe-
   cific arrangements for the transportation of goods by a particular vessel,
   in advance of its sailing day, provided this privilege is indifferently ex-
   tended to all patrons, or if the grant of this privilege to shippers of one
   commodity does not interfere with the carrier's discharge of duty to the
   shippers of other commodities with respect to the receipt and trans-
   portation of their goods. The same rules which govern a carrier by sea
   in the reception of goods for transportation apply to the carrier's en-
   gagements to transport by a particular vessel, or within a specified
   limit of time.
6. There was evidence authorizing a finding that the defendant discrimi-
   nated against the plaintiff in the reception and transportation of lumber
   tendered for shipment, and the court did not abuse his discretion in
   granting an ad interim injunction.

Argued May 22, 1908.—Decided January 15, 1909.—Rehearing denied February 10, 1909.

Injunction. Before Judge Cann. Chatham superior court.
January 28, 1908.

The Ocean Steamship Company is a common carrier operating
three vessels between the ports of Savannah, Georgia, and Boston,
Massachusetts, and six vessels between the ports of Savannah and
New York. The Savannah Locomotive Works and Supply Com-
pany is a corporation engaged in buying and selling lumber to
persons living in Boston and other eastern points. In September
and October, 1907, there occurred at the port of Savannah a con-

gestion of cotton and lumber shipments, destined from Savannah to Boston. The plaintiff brought suit against the carrier to enjoin certain discriminations against it, alleged to be as follows: (1) The carrier received and transported, in preference to the lumber offered it by the plaintiff, the lumber of other shippers of later tender, where the same was offered it under through bills. of lading issued by railroads at points in the interior; (2) it received and transported, in preference to the plaintiff's lumber, cotton and naval stores of later tender, offered by other shippers; and (3) it contracted with persons dealing in cotton, in advance of the sailing day of a vessel, that it would carry the cotton thus agreed to be transported on a particular steamer, but declined to make, in advance of the sailing of a vessel, a similar contract with the plaintiff or other lumber merchants to carry lumber on a particular steamer; and the carrier transported the cotton of other patrons in compliance with its contract, and refused to receive and transport the plaintiff's lumber of prior tender. The steamship company denied that it discriminated against the plaintiff in favor of other shippers; it denied that it discriminated against lumber in favor of cotton and other articles of commerce in the facilities afforded for transportation; it admitted that it made with shippers of cotton specific engagements in advance for the shipment of cotton on particular vessels, where such cotton was intended for foreign shipment by way of New York, and that it refused to "book" ahead lumber, because it was unable, in the course of its business as a common carrier, to contract reservations for future shipments of lumber by its vessels, for the reasons set out in the answer. On the interlocutory hearing the defendant was enjoined, from "booking future shipments of cotton and other articles of commerce for persons dealing in the same until it places plaintiff upon a substantially similar basis for booking lumber for future shipment, wherever the storage capacity and safety of the ships permit such equality of basis of booking; from receiving or carrying any lumber or other articles of commerce of similar character and similarly circumstanced, tendered to defendant for shipment, until it receives and carries lumber of the plaintiff tendered to defendant at a prior date, the storage capacity and safety of defendant's ship permitting; and from receiving or carrying any articles of commerce similarly circumstanced, for any

other person, until it carries for plaintiff lumber tendered to it for shipment prior to the date of the tender of said articles of commerce for shipment, the storage capacity and safety of defendant's ships permitting; and from refusing to receive and carry the lumber of plaintiff in the order in which it is tendered for shipment, provided the storage capacity and safety of the ship permits such reception and carriage."

*Lawton & Cunningham* and *H. W. Johnson,* for plaintiff in error.

*Osborne & Lawrence* and *Hitch & Denmark,* contra.

EVANS, P. J. (After stating the foregoing facts.)

1. It was admitted in the answer of the defendant that it was a common carrier by sea, operating a certain number of vessels between the port of Savannah, Georgia, and the ports of Boston, Massachusetts, and New York City, and accustomed to carry the particular commodity offered it by the plaintiff, and against which it is alleged to have discriminated. From the earliest times it has been considered that a common carrier exercises a public employment, with public duties to perform. He can not, like a merchant, receive or reject a customer at pleasure. He is bound to serve the public indifferently, and this duty with respect to the commonness of service was regarded by Judge Nisbet as the distinguishing trait of a common carrier. *Fish* v. *Chapman, 2 Ga.* 349 (46 Am. D. 393). In the case just cited it was said that "a common carrier is bound to convey the goods of any person offering to pay his hire, unless his carriage be already full, or the risk sought to be imposed upon him extraordinary, or unless the goods be of a sort which he can not convey, or is not in the habit of conveying." If the carrier be under obligation to accept goods which he proposes to carry, and there is room for them in his vehicle, the time for acceptance is when the goods are tendered. It therefore follows that all applying have an equal right to have their goods transported in the order of their tender. Indeed, the proposition is too well established at this late day to require citation of authorities. 6 Cyc 372; 5 Am. & Eng. Enc. L. (2d ed.) 1772; Hutch. Car. (3d ed.) §512.

Counsel for the plaintiff in error contend that at common law a carrier has the right to discriminate in the facilities offered to shippers of different commodities, so long as shippers of the same

53

commodities are all treated alike; and that this right of discrimination justifies a preference given to shippers of cotton over the shippers of lumber in the order of acceptance of these 'commodities for transportation. We have examined the cases cited to support this contention, as well as many others on the same general subject; and we find in all of them, which concede to a carrier the right of discrimination among shippers, a recognition of the principle that the right to discriminate only arises when the carrier has fulfilled his obligations to the shipper affected by the alleged discriminatory conduct. We do not think any case which has come under our notice goes further than to hold that when a carrier extends a favor to one shipper, such favor is not to be regarded as an unjust discrimination so long as the carrier by granting the favor does not deny to other shippers any right which they may demand under the law, and the favored shipper is not given any material advantage in competition in business with them. A brief reference will be made to some typical cases, to illustrate the accuracy of our analysis. There are a considerable number of decisions which hold, that at common law the carrier was under no duty to charge every patron the same rate of carriage; that his duty was to charge a reasonable rate, and, if the rate charged was reasonable, one shipper could not lawfully complain that other shippers were charged a less rate. Johnson *v.* Pensacola & P. R. Co., 16 Fla. 623 (26 Am. R. 731) ; Ragan *v.* Aiken, 9 Lea, 609 (42 Am. R. 684). Some courts hold, that, inasmuch as a carrier has the right to demand of all shippers the prepayment of his freight charge, it was not undue discrimination to exact of one shipper payment of the carriage charge in advance of carrying the freight, and collect it from other shippers at the end of the transportation. Randall *v.* Richmond, etc. R. Co., 108 N. C. 612 (13 S. E. 137). The Supreme Court of the United States has decided that railroad companies may transport the traffic of one express company and refuse to transport the traffic of another express company over their lines, because "they are not obliged by common law or by usage to do more as express carriers than to provide the public at large with reasonable express accommodations; and that they need not, in the absence of a statute, furnish to all independent express companies equal facilities for doing an express business upon their passenger-trains." The Express Cases, 117 U. S.

1 (6 Sup. Ct. 542, 29 L. ed. 791). In these cases the complaining shippers were accorded by the carriers every legal right which they could lawfully exact; and their complaint was, not that the carriers were remiss in any duties to them, but that they were entitled to share in the favors extended to other shippers. In the case in hand, the complaint is that the carrier denies the plaintiff a substantial legal right; that the carrier owes it a duty to accept its lumber in the order of its tender, and that the carrier refuses to perform this duty and is prevented from performing it by giving a preference to the shippers of cotton. The gist of the complaint is not so much that favors are shown the shippers of cotton as it is that the bestowal of these favors interferes with the steamship company in discharging its duty to the plaintiff by accepting its commodity in the order of its tender.

We are also cited to the case of *Central of Ga. Ry. Co.* v. *Augusta Brokerage Co.,* 122 *Ga.* 646 (50 S. E. 473, 69 L. R. A. 119), as sustaining the contention that a carrier may discriminate in the facilities offered to shippers of different commodities, so long as shippers of the same commodity are treated alike. In that case the shipper claimed that the railroad company delivered, to his competitor in the same commodity, cars for unloading at his competitor's private warehouse, and refused to deliver to the plaintiff, at his private warehouse, cars to be forwarded over the railroad of another company; and the refusal of the railroad company in this respect was alleged to be a breach of a certain rule of the railroad commission. It was held that the rule of the commission did not apply to discrimination in commodities. In the discussion of the points involved it clearly appeared that the alleged discrimination did not consist in the denial of any right to the plaintiff which the carrier was under duty to grant, but that the cause of action in this particular hinged upon the refusal of the carrier to deliver its cars at the plaintiff's warehouse for shipment over the railroad of another company, solely because it switched cars for unloading to the private warehouse of a competitor.

Much stress is put upon an adjudication of the Supreme Court of Arkansas in the case of L. R. & Ft. S. R. Co. v. Oppenheimer, 64 Ark. 271 (43 S. W. 150, 44 L. R. A. 353). This was a suit for a penalty, under an Arkansas statute prohibiting discrimination by railroads. It appeared that the plaintiffs were merchants

at a non-competitive station on the carrier's line, and that the carrier failed to furnish sufficient cars to move the cotton from that station, while sufficient cars were furnished a competitive point. The Supreme Court reversed the judgment of the trial court on the merits of the case, and it was said that "the complaint of unjust discrimination grew out of the unusually large cotton crop of 1891. Sufficient transportation was not furnished them, because applicants had not anticipated it." The complaint was not that the railroad company refused to accept the plaintiff's cotton, but that it failed to provide sufficient cars for its prompt transportation. Besides, that case is controlled by the principle that a railroad company, as a public institution, is bound to provide only such facilities for the transportation of freight which might ordinarily be anticipated, and as the same number of cars were furnished in 1891 as had been furnished in previous years, which were sufficient to move the freight at plaintiff's station, the railroad had discharged its duty, and in the regulation of its business it could devote its other cars to meeting the demands of its business at competitive points.

From an examination of the authorities we conclude that by the common law a common carrier not only is obliged to receive and carry such goods as he is able to carry and customarily does carry, but he is required to carry for all patrons alike; all applying have an equal right to have their goods transported in the order of their application. Houston etc. R. Co. *v.* Smith, 63 Tex. 322 (22 Am. & Eng. R. Cases, 421).

2-4.  At common law a carrier's duty to receive goods was limited to his facilities for transportation. The owner of a single ship may hold himself out to the public to carry certain goods for hire. As to the goods he proposes to carry he is a public carrier; but he is under no obligation to provide other ships because his vessel is inadequate to transport all goods which may be offered him. Such a carrier does not owe to the public all the duties imposed by the law on railroad companies and similar public institutions to furnish adequate transportation facilities for all goods which may be tendered. Railroad companies are public institutions, and are granted certain exclusive franchises and rights which naturally impose correlative duties. They are invested with the power of condemnation, by the exercise of which sovereign

right they acquire an exclusive privilege to carry on their business over the highway constructed by them. They are endowed with special and unusual powers, with an express view to their rendering to the public adequate service. The conference of these unusual powers raises an obligation not only to serve the public impartially, but to serve the public efficiently. Upon them the law imposes the obligation to furnish sufficient facilities for the reasonably prompt transportation of goods tendered for carriage; and they are bound to provide sufficient cars for transporting, without unreasonable delay, the usual and ordinary quantity of freight offered to them, or which might reasonably and ordinarily be expected. 5 Am. & Eng. Enc. L. (2d ed.) 167. A navigation company like the defendant, which receives no franchise from the State to use the open sea, and which enjoys no monopoly or right of eminent domain, owes no duty to the public to furnish adequate facilities to transport all of the traffic of the ports of its termini. It is under no obligation to buy other ships, because it does not undertake to carry any more goods than its vessels will safely accommodate. If there is a demand for more ships, the commercial necessities will regulate the deficiency in transportation service, either by voluntary enlargement of the facilities of existing ship lines, or the establishment of new ones.

A carrier, not a public or quasi-public institution, may select the class of goods which he proposes to carry. Whether the right of selection may include the right to limit the quantity of any commodity he proposes to carry, provided he gives public notice of the limitation, is not before us.

5. The principal complaint of the complaining lumber dealer is against the system of booking cotton for a particular vessel in advance of its sailing day. It is said that this practice results in accumulating large quantities of lumber and cotton at the port of Savannah beyond the immediate carrying capacity of the steamship company's vessels, and that "booked" cotton is transported in preference to lumber tendered subsequent to the booking but prior to the arrival and receipt of the "booked" cotton; and that the steamship company refuses to accord to lumber dealers the privilege of booking their commodity. The system of "booking," as explained in the record, is the practice of the steamship company to make specific engagements with shippers of cotton for a reserva-

tion of space for cotton to be shipped on a particular vessel, in advance of its sailing day. If the steamship company indifferently extended this privilege to all of its patrons and to all commodities, we do not think it would violate any duty which it owed the public. The basal principle of the requirement of the common law that a common carrier must convey the goods of all persons offering to pay his hire, unless his carriage be already full, is that there should be no unjust preference given one member of the public over another. The practice of making specific engagements in advance of the shipment, if the privilege is indifferently extended to all, is but another form of acceptance of goods tendered in the order of their application. The same impartiality of service is rendered when public notice is given by the carrier that he will "book" the freight of all patrons, and reserves space for the goods engaged to be transported as if he had received the goods of the shipper in the order of their tender. But when a carrier reserves space in his carriage for a favored patron, or a favored commodity, not perishable in its nature, and refuses to reserve space for another patron or commodity, he fails to afford that commonness of service which the law annexes as an incident to his business. The steamship company may discontinue to carry any particular commodity it desires, or it may voluntarily cease to do business as a common carrier and engage in the business of a special carrier; but so long as it pursues the business of a common carrier, it is bound to render to the public the service which the law exacts of a common carrier.

6. The requirement of the common law that a common carrier must receive goods offered for transportation in the order of their tender can not, on principle, be affected either by the place where the shipment originates, or by the ultimate destination of the goods. There is no reason why the steamship company should prefer freight tendered in a car from one forwarding agency, and deny freight similarly tendered by another forwarding agency or shipper. If the steamship company desires an inland carrier to issue through bills of lading, it may do so subject to its obligations to receive and carry freight in the order of its tender. The mere fact that a particular commodity is destined to a foreign port can not justify a carrier in giving a preference to it over the same or another commodity because the latter may be a domestic

shipment. It is urged that in apportioning its space to the various commodities, according to the volume of freight at the port, no discrimination was shown by the steamship company against lumber shipments in favor of cotton or other articles of commerce. Some of the reasons advanced are, that the steamships are built with a view to the packet trade; that lumber is bulky, and can not be as expeditiously handled as cotton; that the vessels are advertised to sail on particular days, and to require a greater percentage of lumber to be carried than was carried would not enable the vessels to observe their sailing dates; that there is a congestion of freight, and a larger percentage of lumber than of cotton is carried; that cotton moves only within three or four months of the year, whereas lumber moves evenly throughout the year; that the price of cotton is liable to fluctuation, while that of lumber is more constant; that cotton is the great staple crop of the State of Georgia, and that a larger number of the public is served by the prompt transportation of cotton to the preference of lumber. With respect to the contention that if the steamship company accepted all the lumber which was tendered to it, its vessels could not sail at the advertised times, the evidence was in conflict. As previously indicated, the steamship company is under no duty to carry all the freight of the port of Savannah; so that the main question on the facts is whether cotton possesses such inherent qualities as to permit a preference to be given to that commodity over all other articles which the steamship company customarily carries. We fully appreciate the value of the South's great staple product, and are aware that for years the slogan has been that "cotton is king." But the great value of the cotton crop and the importance of its prompt transportation gives to that staple no imperial rights over the other products of this State. It is not perishable in its nature, and it will not be contended that its fluctuation in price is so violent that a delay in transportation would substantially destroy its value. On the whole, after a careful consideration, we think that under the legal principles applicable to the facts of the case there was no abuse of discretion in the grant of an ad interim injunction. The terms of the injunction did not extend to matters outside of the pleadings, nor are they indefinite and uncertain.

*Judgment affirmed. All the Justices concur, except Fish, C. J., absent.*