GRACE LINE, INC., Petitioner,

v.

FEDERAL MARITIME BOARD,
Respondent.

No. 229, Docket 25744.

United States Court of Appeals
Second Circuit.

Argued March 28, 1960.

Decided July 13, 1960.

Moore, Circuit Judge, dissented.

Lawrence J. McKay, New York City, Cahill, Gordon, Reindel & Ohl, New York City (Arthur Mermin, New York City, Raymond L. Falls, Jr., Youngstown, Ohio, of counsel), for petitioner Grace Line Inc.

Irwin A. Seibel, Washington, D. C., E. Robert Seaver, Gen. Counsel, Robert E. Mitchell, Asst. Gen. Counsel, Edward Aptaker, Chief, Regulation Branch, Robert J. Blackwell, Atty., Federal Maritime Board, Robert A. Bicks, Asst. Atty. Gen., Richard A. Solomon, John J. Voortman, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before HAND, WATERMAN and MOORE, Circuit Judges.

HAND, Circuit Judge.

This case comes before us upon a petition of the Grace Line to review (§ 1032 of Title 5 U.S.C.A.), an order of the Federal Maritime Board under the United States Shipping Act, §§ 812 and 815, Title 46 U.S.C.A. The order was made by the Board after a hearing before one of its "Examiners," and the question is whether the Grace Line, which is concededly a "common carrier by water" of many kinds of goods in trade between South American countries and the United States violated § 812 (Fourth), and § 815 (First) of Title 46 of the United States Shipping Act by unjustly discriminating against shippers of bananas as to "cargo space accommodations," and by the "unreasonable preference" of three shippers of bananas which it accepted from Guayaquil, Ecuador, to New York. The position of the Grace Line is that, because it has always carried bananas on a "contract" basis, and has never "held itself out as a common carrier" of bananas, it has the privilege of allocating its cargo space, and confining its carriage, to those shippers that it prefers. The Board held that because the Grace Line was a "common carrier by water" within §§ 812 and 815, it might not evade those sections as to any part of the goods that it lifted, but must give all shippers of bananas equal access to its ships. We reversed a similar order in the same case (263 F.2d 709) because the Board had based its holding only upon the fact that the bananas were "susceptible" of "common carriage" which we thought to be insufficient since all, or nearly all, goods are "susceptible" of "common carriage."

Bananas require a special kind of carriage. They must be laded in refrigerating compartments ("reefers") in which the temperature is kept within specified limits. No matter how cared for, they cannot be kept merchantable for more than three weeks after they have been cut, during which period their ripening continues although a "reefer" will somewhat delay it. Guayaquil has no means of refrigerating bananas while they await lading in a ship, which is done from barges brought alongside. For these reasons a shipper must know in advance upon what space and upon what ship he can rely to lade and carry a specific consignment, for speedy dispatch to the ultimate consumer is an absolute condition of the business. The order of the Board specified certain conditions to which a shipper must conform in order to become entitled to "common carriage," but the sufficiency of these is not in dispute here. The Grace Line began the carriage of bananas in 1934, and has built up a very substantial business. Continuously from the outset all its banana carriage has been by "special contract" and has been limited to three shippers at a time, though one of these has been changed. It insists that since no carrier becomes a "common carrier" which does not "hold itself out" as such, and since it has never done this as to bananas, it is only a "contract carrier" as to them, and §§ 812 and 815 do not apply. Hence, it says, the sections gave

the Board no jurisdiction to regulate its banana business. Four shippers of bananas have been denied any space in its "reefers" and intervened in the proceeding before the Board.

■ We accept the test that at common law a carrier becomes a "common carrier" only when it "holds itself out" as such, so that the issue at bar resolves itself into whether §§ 812 and 815 are to be construed to mean that a carrier which "holds itself out" as a common carrier of certain kinds of goods, is such only as to those goods and may carry by "special contract" any other kinds of goods it pleases. At common law there was no doubt, that a "common carrier" may on occasion carry by contract. For example, in the Express Cases, 117 U.S. 1, 6 S.Ct. 542, 628, 29 L. Ed. 791, on which the Grace Line especially relies, the railroads were allowed to choose their own express companies for the carriage of goods sent by express. Again, in United States v. Louisville & Nashville Railroad Co., 6 Cir., 221 F.2d 698, a railroad was allowed to fix its charge against the United States for the carriage of silver electrical equipment which the freight classification rules provided that it should not carry. However, for the reasons we shall give, we think that we need not decide in what circumstances, if at all, a carrier ever becomes subject to a common law duty of equal treatment of shippers of goods as to which it has never specifically held itself out as "common carrier." For instance, we need not express any opinion whether the privilege of carrying by "contract" is limited to those situations in which there are no competing shippers for the space granted to a preferred shipper, or to the cargoes of chartered ships, or to what other situations, if any. *Arguendo*, we will assume that in the case at bar the Grace Line would be privileged at common law to select favorites from among banana shippers who were competing for cargo space in "reefers."

■ We may leave that question open because we think that §§ 812 and 815 should not be construed to give any "common carrier" the right to "unjustly discriminate against any shipper in the matter of (a) cargo space" (§ 812), or to "give any undue or unreasonable preference or advantage to any particular person" (§ 815). The Grace Line's argument presupposes, not only that these duties are limited to "common carriers by water," as of course they are, but also that they are limited to such carriers while they are carrying goods as to which they have "held themselves out as 'common carriers.'" We can see no reason to impute such a limitation upon the definition of "common carrier" in § 801.

■ The respondent was organized as part of a policy of "encouraging, developing, and creating * * * a merchant marine to meet the requirements of the commerce of the United States" (prologue to Chapter 451, 39 Stat. 728), and the Board, created in 1936, was given power to "investigate" any complaint setting forth any violation of Chapter 451 by "a common carrier by water" and to "make such order as it deems proper" (§ 821). That of course does limit the Board to the regulation of "common carriers," but we can see no reason for further limiting it to the conduct of such carriers in areas in which they have "held themselves out" as "common." It may tend to impair the maintenance of a "merchant marine" to allow an indubitable "common carrier" to determine at its pleasure that as to some goods it will unjustly discriminate among its shippers by doing all its business with them on a "contract" basis. It may be, indeed it is, true that we should not deal with such interests by generalizations; and that each case should be decided on its peculiar merits, but that is exactly what will be within the power of the Board, unless we add to the phrase "common carrier," the suffix, "while acting as such." There is no verbal necessity for doing this and there is every reason of declared policy to assume that the term was used to include all those who were to some degree "common carriers." Certainly the Board is prima facie better

qualified than are courts (Roberto Hernandez, Inc. v. Arnold Bernstein Schiffahrtsgesellschaft, M.B.H., 2 Cir., 116 F.2d 849, 851) to decide when, if at all, a transportation company, which has accepted the status of "common carrier" as to some of its activities, will prejudice the "developing of a merchant marine" by allowing access to its cargo space only to its favorites, instead of to all shippers who qualify for the kind of carriage involved.

■■ No doubt it is relevant in a carrier's or the Board's decision that the goods require "special" carriage, as bananas do. Certainly the carrier is empowered to prescribe these requirements, save only that they be reasonable ones; and no shipper who cannot give assurance that he can, and will, conform to them need of course be considered. All that is here involved is that, if a shipper qualified, he may not be denied space at the pleasure, and for the profit, of the carrier. It appears to us that when Congress enacted authoritative supervision over the equal treatment of shippers it could not have meant to perpetuate what, so far as it may perhaps still exist at common law, would be an exception to the primary purpose of the statute as a whole. Happily we are not confronted even with a verbal embarrassment; for, as we have just said, a "common carrier by water," does not cease to be such because it chooses to make an exception as to a part of the goods that it accepts.

Petition denied.

MOORE, Circuit Judge (dissenting).

I dissent.

The report and order of the Federal Maritime Board, the "Board" (and the affirmance thereof by the majority) are, in my opinion, at such variance with fundamental principles of freedom of contract, so misconstrue the purpose to be served by the Board and so exceed the powers granted and intended to be granted by Congress to the Board that I cannot subscribe to the decision. Furthermore, the decision now rendered is directly contrary, in my opinion, to the recent decision of this court in this very case.[1] The history of the case is interesting.

### The Facts

The facts are virtually undisputed; only the legal conclusions therefrom are in issue. Prior to 1934 Grace Line had been engaged in carrying passengers and freight in its vessels between the west coast of South America and North Atlantic ports. It had never carried bananas and had no facilities to do so. Because of the unique nature of the banana and the highly specialized requirements for its successful transportation (hereinafter more fully developed), ordinary cargo space could not be used for this purpose. Special refrigerated and ventilated compartments were required. Of prime importance to Grace Line was the assurance that, if it made the necessary substantial capital investment to install such compartments, it would have a customer which would regularly use the space over a long period so as to justify the expenditure. To the shipper, regularity of service and a long-term contract were also essential to a practical business enterprise in banana importation.

A few refrigerated compartments having been installed in 1934, Grace Line executed its first long-term contract with a shipper. Subsequently, certain other shippers (but not more than three at once) have used Grace Line's special facilities—always under similar long-term contracts.

At the present time, Grace Line still has a comparatively limited space for the carriage of bananas, consisting of six compartments (approximately 20,000 cubic feet each) on its weekly passenger-freight vessels, and four compartments (approximately 23,000 cubic feet each) on its fortnightly freighters. Since 1934 no shipper has taken less than a full compartment. Because of this space limitation and because of its prior contractual commitments, Grace Line during the

---

1. Grace Line, Inc. v. Federal Maritime Board, 2 Cir., 1959, 263 F.2d 709.

years has been unable to honor requests for banana space from 31 persons and firms, exclusive of the two complainants and five intervenors in this proceeding.

The two complainants, Banana Distributors, Inc. and Arthur Schwartz, complaining that Grace Line's present contracts with its three shippers are "contrary to law and void," by formal complaint have asked the Board to order cancellation of the now outstanding contracts and to cause Grace Line immediately to allot a portion of its refrigerated space to complainants. Since complainants themselves concede that the banana importation business cannot be carried on successfully except under long-term contract, they demand that the existing two years' contracts be cancelled, that the shippers who have built up and maintained regular shipments for many years be forthwith ousted and that complainants be given similar contracts. Anomalously and by some legerdemain quite foreign to my concepts of logic, the Board found the present contracts to be illegal as inconsistent with common carriage and then proceeded to award the same type of contract to the complainants. To me this is the usurpation by a governmental administrative agency of powers which would turn it into a superstate freight forwarding company with autocratic rights to decide which persons or importing companies should or should not engage in the banana trade and to direct how a steamship company should conduct its business. Needless to say, Grace Line appealed.

### The First Appeal

On the first appeal, the issue of the validity of the Board's order was squarely raised. That order (served on August 20, 1957) amongst other directions ordered Grace Line to desist from continuing and performing its outstanding contracts within approximately six weeks and to offer to all qualified shippers refrigerated space to begin not later than October 1, 1957 for periods not to exceed two years. Grace Line was required to file with the Board, copies of the "two-year forward-bookings entered into hereunder" and "the criteria used by respondent [Grace Line] in determining what shippers are qualified" (presumably so that the Board could revise the business judgment and discretion exercised by Grace Line in operating its vessels).

The points raised by Grace Line upon appeal (virtually the same as now presented) were in substance that "Grace Line is a contract carrier of bananas"; that it did not hold itself out as a common carrier of bananas; and that the Shipping Act does not extend to a contract carrier of bananas.

The Board contended that under the Act a common carrier by water cannot act as a contract carrier with respect to a particular commodity which it transports in the same vessel as its common carriage. Thus, the Board took the definite position that an ocean carrier which transports commodities for the public generally cannot carry a particular commodity on a contract basis. Since Grace Line lists over four thousand items transported in common carriage, the Board concluded that contract carriage of any commodity was forbidden regardless of its unique character and the need for special facilities on the ship.

This court reversed the Board's order and citing many Supreme Court supporting cases said that "there are minimal standards beyond which the courts cannot allow administrative bodies to go," that "The reviewing court must satisfy itself that the administrative decision has a 'rational' or 'reasonable' foundation in law * * * (citing cases)" * * * and that "when not so satisfied the court must reverse the administrative action, * * *" (263 F.2d 709, 711). Thus, in reversing and remanding, this court clearly decided that it was not satisfied that the Board's decision had a rational or reasonable foundation in law. The Board's contention that specialized cargo could not be carried by contract on the same vessel which also carried general cargo in common carriage was not accepted, Judge

Waterman saying for the court (at page 711):

"The Board reasoned that since bananas are susceptible of common carriage petitioner could not transport them otherwise than in common carriage. Such a test, a test based upon susceptibility only, tends, in effect, to eliminate contract carriage. Most, if not all, commodities are 'susceptible' of common carriage. This susceptibility test would appear to be clearly contrary to the Congressional purpose, for it is obvious that Congress intended that sections 14 and 16 should apply not to all carriers but only to 'common' carriers by water."

Had this court been willing to accept the Board's thesis that no commodity could be carried in contract carriage on a vessel also carrying goods in common carriage, affirmance was required. Such a holding, of course, would eliminate contract carriage. But this the court was unwilling to do because it believed such a result would be contrary to Congressional purpose and intent. Accordingly, it reversed and remanded the Board's order.

On remand merely "upon further consideration without arguments or hearings" and upon the same record and the same examiner's report, the Board decided that if this Court did not like its words "susceptibility test," it would "arrive at the same conclusion without reference to the susceptibility test." And so it did. Since the Grace Line's and the Board's arguments on this appeal are identical with those presented on the previous appeal, the case is now in the same posture as it was on the first appeal. The Board has paid no attention to the significance (if any) of the susceptibility test except to issue an order which is for all purposes the same as the order previously reversed. It is even called a "Supplementary Order" based upon a "Supplementary Report" which would make both appendages to the reversed order and the first report.

This analysis of the previous proceedings has been made because there is now a decision by the majority that denies to a common carrier the right to engage in contract carriage even though the merchandise concededly requires special handling and space and the importing business, which gives rise to the need for transportation space, demands long-term contracts and regular shipments. To admit, as does the Board, that Grace Line could carry bananas on a separate ship devoted to contract carriage but could not construct special compartments on one of its present ships for this purpose is to create an artificial principle devoid of logic or reason. Grace Line as owner of many ships does not shift its status according to the name of the ship on which the goods are loaded.

### The Banana Shipping Problem

Taking the facts only as found by the examiner and the Board, "only a limited quantity of fruit can be loaded in the reefer [2] space of Grace's vessels. If applicants be allocated part of the current space, the volume of bananas handled by Grace would be no greater than now, the only difference being that some if not all of the displaced fruit probably would become available to the new shippers." In other words, the old contract holders with whom Grace Line had done business for years would be replaced by newcomers with whom by Board edict new contracts would have to be made.

Most of the bananas imported into the United States originate in Central and South America. The bananas here involved are grown in Ecuador. Admittedly, the banana is a unique fruit in many respects, beginning to ripen immediately upon cutting. As its life span is about three weeks between cutting and marketing, quick transportation to market under favorable conditions is most important. Shoreside refrigeration before shipment or after unloading will not re-

2. Refrigerated.

tard, appreciably, the ripening process. Furthermore, the additional handling in and out of storage will tend to injure the fruit and would subject it to increased costs.

The banana plant is very fast growing, beginning to produce in approximately 12 months. By careful pruning and constant cultivation, production can continue for many years. Cuttings once every 7 to 14 days are necessary, and since not more than five stems to the acre come to the proper grade each week, the cutter must go through the whole plantation each time. Most cuttings in Ecuador are made on orders which enable the fruit to reach Grace's vessels within 48 hours. The fruit is loaded in barges and brought down the streams at night. Loading on the vessels begins early in the morning and usually is completed within 12 hours.

Bananas throw off carbon dioxide gas in large quantities; in addition, they generate heat. The more advanced the fruit the greater tendency there is to ripen other fruit in the compartment. Proper refrigeration, ventilation, and stowage therefore are most important during the ocean transportation. Because individual shippers have their own particular views on the subject, under the Grace Line banana contracts, precooling and ventilation of the vessel's compartments are matters of discussion between the shipper and the vessel's chief engineer and the refrigeration engineer.

### The Board's Order

As in the original reversed order, the Board in its supplementary order directs Grace Line to discontinue its present contracts and to offer "to its present shippers and to all qualified shippers, including complainants and their supporting intervenors, upon a fair and reasonable basis and upon reasonable notice, refrigerated space for the carriage of bananas on respondent's vessels from Ecuador to U. S. Atlantic ports for a period not to exceed two years, said period to begin not later than July 1, 1959, and shall thereafter offer, for periods not to exceed two years, refrigerated space available for such carriage."

The Board's order must have some rational relationship to the factual situation towards which it is directed. The statutory words "unfairly treat or unjustly discriminate" cannot be applied in vacuo. The order requires Grace Line to offer refrigerated space for the carriage of bananas to all. At the present time, three shippers use the six compartments (20,000 cubic feet each or 120,000 cubic feet) on the weekly passenger-freight vessels. The two complainants, Banana Distributors and Schwartz, wish 50,000 cubic feet each on these vessels. The intervenor Martin desires two compartments or 40,000 cubic feet. The intervenor Grayson wants his fair share. The record speaks of 31 other applicants. Disregarding them entirely, although the order calls for a holding out "to all qualified shippers," here is a space demand of over 260,000 cubic feet on vessels having only 120,000 feet of refrigerated space. Surely the power of the Board does not extend to an order that Grace Line convert its passenger-freight vessels largely into banana carriers.

The Board would solve the problem by what it terms a "two-year forward-booking" plan. This is in reality nothing but a continuation of the very contract system which the Board has declared to be illegal. If the Board's pronouncement has any validity, namely, that contract carriage cannot exist on the same vessel as common carriage, this principle should apply to complainants' contracts as well as to those of the present shippers.

Another fact of vital importance is conceded by all. Bananas cannot be cut and brought to shipside by growers with the hope that there will be room enough for their shipment. There are no shore side refrigerating facilities and even if there were, the time elapsing before the next ship would cause spoilage. Therefore the importer must know and be assured before cutting that the bananas cut will be transported on a particular ship under his own refrigerating direc-

tions. Obviously special contracts are required.

As to space, assume the Board puts the present shippers out of business, keeps the 31 other applicants on the sidelines and gives all the space to the complainants and intervenors. Substantial reductions will have to be made in their demands for space. Just as they all are in agreement that short-term contracts are not acceptable, can they operate a profitable importing business on a few bunches of bananas each? And will they undertake to finance a business knowing that in two years (or less if the Board chooses) they will have to discontinue their business and wait until their turns come up again in 4 or 6 years? The examiner already envisions at the end of the two-year period upon the appearance of others "there necessarily will have to be a realignment of the space for the ensuing period" (Dec. p. 204).

The problem presented is radically different from that of merchandise shipped in common carriage. Lumber, coal, steel bars, rubber and coffee can be stored in warehouses. They can be carried in the hold or even on the deck. They do not require the almost incubator care the banana demands. All these factors, in my opinion, establish the necessity of contract carriage. This being so is contract carriage irreconcilable with the statutes?

The statute applies only to a "common carrier by water" (46 U.S.C.A. §§ 812, 815). Grace Line is a common carrier. Common carriers must not give undue or unreasonable preferences as to cargo space. Therefore, syllogistically say the majority, Grace Line must not give preferences. But by this same formula any and all contract carriage by a common carrier is eliminated. I do not so construe the statutes or the intent of Congress.

If "We accept the test that at common law a carrier becomes a 'common carrier' only when it 'holds itself out' as such," Grace Line has not become a common carrier of bananas. The Board concedes that all the bananas carried since 1934 have been "by special contract." This being so, I cannot understand why the majority feels that it "need not decide in what circumstances, if at all, a carrier ever becomes subject to a common law duty of equal treatment of shippers of goods as to which it has never specifically held itself out as a 'common carrier'" particularly since it assumes "that in the case at bar the Grace Line would be privileged at common law to select favorites from among banana shippers who are competing for cargo space in 'reefers.'" If common law is thus discarded, the answer must be found in the statutes. Here then is a decision which holds, in effect, that no common carrier can engage in contract carriage. This is a serious decision to make with respect to the American merchant marine. It may well be that Congress might wish to demand that the price of its subsidy should be the elimination of all contract carriage. This issue, however, should be decided by Congress after hearing the merits from both sides and not by the Board or the courts. If a susceptibility test, rejected by this court, "tends, in effect to eliminate contract carriage," this decision definitely eliminates it.

This court's comment that "it is obvious that Congress intended that sections 14 and 16 should apply not to all carriers but only to 'common' carriers by water" (263 F.2d 709, 711) would appear to indicate that a distinction between "common" and "contract" carrier still exists and that the restrictions imposed by sections 14 and 16 would not apply to contract carriage. I cannot subscribe to the opinion that Congress intended by its statutory language or by implication to deprive the owner of a vessel or vessels generally engaged in common carriage of the privilege of devoting a small portion of its property to special use by persons with whom for good and sufficient reasons of commercial expediency it has made special contracts. Nor do I accept the issue as posed that "All that is here involved is that, if a shipper qualified, he may not be denied

space at the pleasure, and for the profit, of the carrier." There is no proof in the record of any such quixotic selection of shippers.

The authorities put forward by both parties, presumably after intensive research, are of little assistance. Shipments of lumber, a non-perishable commodity, Patrick Lumber Company v. Calmar Steamship Corporation et al., 2 U.S. M.C. 494 (1941), silver electrical equipment United States v. Louisville & Nashville Railroad Co., 6 Cir., 1955, 221 F.2d 698, cotton Ocean S.S. Co. v. Savannah Locomotive Works & Supply Co., 1909, 131 Ga. 831, 63 S.E. 577, 20 L.R.A.,N.S., 867 or coal Pennsylvania R. Co. v. Puritan Coal Mining Co., 1915, 237 U.S. 121, 35 S.Ct. 484, 59 L.Ed. 867, are not helpful illustrations. Most analogous in a specialty field is a case involving a railroad, obviously a common carrier, which for years had carried livestock on a private contract basis. The court there held that the railroad was not a common carrier of livestock. Lake Shore & Michigan Southern Railroad v. Perkins, 1872, 25 Mich. 329.

The Supreme Court gave recognition to "why special contracts in reference to this business [express] are necessary" (Express Cases, 117 U.S. 1, 23, 6 S.Ct. 542, 553, 628, 29 L.Ed. 791) and selected as relevant to that determination criteria present in banana transportation, namely, speed, reasonable certainty in arrival time and careful custody. So many additional factors relating to specialized care of bananas are found here that *a fortiori* reasoning requires the same conclusion. This is really the only [3] case in which the question of limited space reserved by a common carrier for contract carriage was involved. The language of Mr. Chief Justice Waite could easily be paraphrased to fit the situation here.

"As the business to be done is 'express,' it implies access to the train for loading at the latest, and for unloading at the earliest, convenient moment. All this is entirely inconsistent with the idea of an express business on passenger trains free to all express carriers. * * * This implies a special understanding and agreement as to the amount of car space that will be afforded, and the conditions on which it is to be occupied, the particular trains that can be used, the places at which they shall stop, the price to be paid, and all the varying details of a business which is to be adjusted between two public servants, so that each can perform in the best manner its own particular duties. * * * The car space that can be given to the express business on a passenger train is, to a certain extent, limited, and, as has been seen, that which is allotted to a particular carrier must be, in a measure, under his exclusive control" (117 U.S. 1, 23–24, 6 S.Ct. 542, 553).

The Board acknowledges "that banana shippers have made substantial investments in their trade, that the entire operation from grower in Ecuador to retailer in the United States, requires careful coordination, that bananas ripen rapidly, that care in shipment is essential, that the fruit is highly perishable, and that loading is difficult and must be accomplished within a relatively short time" (Supp.Report, p. 230). The examiner likewise conceded that loading "presents practical problems"; that "the mixing of the fruit of more than one shipper in the same compartment can have unfavorable results"; that although there "might be some confusion at first, and understandably so, that fact alone should not preclude a bona fide trial period." After enumeration of factors which conclusively establish that banana transportation requires special care and equipment, the examiner avoids both the facts and the real issue by saying "The mere fact that bananas generally have been carried under special contract for

---

3. I do not regard the contract carriage of a particular dog by a particular individual in England in 1886 as particularly determinative of the problem here (Dickson v. Great Northern Ry., 18 Q.B.D. 176 (CA1886)).

a long time (the record is clear on this point) does not necessarily make them a specialty or justify their carriage in that manner" (Dec., p. 199). The need for contract shipment does not rest upon any such ground. And if the examiner's plan, adopted by the Board, results in damage, he is satisfied by the thought that "Bananas are not the only fruit subject to damage in transit, as is attested by the many cases in the law books." Whether the Board should by its decisions add to those cases or attempt to reduce them rather answers itself.

In final analysis the report of the examiner and the orders of the Board to me more closely evidence a desire to perform a guinea pig experiment on the shipping industry rather than to cope in a practical way with the banana shipping problem. Without any personal responsibility or financial investment in any phase of the operation, they can safely issue decrees and watch with interest the result. A division of space amongst all might well make importation of bananas unfeasible for all. There are certain laws which the Board cannot change by order. The order will not enlarge the compartment space, it will not avoid the shipside loading, it will not change the ripening habits of the banana. The inexorable laws of economics and nature will not yield even to the Board. If the Board's order is enforced, there may be bananas in the same compartments and the same contract forms may be used. Only different shippers' names will appear thereon. "Newcomers to the trade," as the Board chooses to call them, will be the beneficiaries by Board order of the space and thus "unfairly treat or unjustly discriminate" against their would-be fellow shippers. And all this under the guise of the preservation of rights. But, *quaere*, of whom?

For all practical purposes, the sought-for application of Sections 14 and 16 of the Shipping Act of 1916 to the highly specialized limited space transportation of bananas would appear to present a case of first impression. The Board stands on at least a definite proposition that a common carrier cannot carry on the same vessel in special compartments goods by contract. With this proposition I disagree as a matter of reasonable interpretation of the statutes. Had Congress wished to outlaw contract carriage by common carriers, it would have or should have so legislated.

I would reverse again the Board's original order and reverse the supplementary order.