342 F.2d 924
 119 U.S.App.D.C. 345
 FLOTA MERCANTE GRANCOLOMBIANA, S.A., Petitioner,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents, PhilipR. Consolo, Intervenor.
Philip R. CONSOLO, Petitioner,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents, FlotaMercante Grancolombiana, S.A., Intervenor.
 Nos. 18230, 18235.
 United States Court of Appeals District of Columbia Circuit.
 Argued May 4, 1964.
Decided Dec. 17, 1964, Certiorari Granted June 1, 1965, See
85 S.Ct. 1764.
 
 Mr. J. Alton Boyer, Washington, D.C., with whom Mr. Odell Kominers, Washington, D.C., was on the brief, for petitioner in No. 18,230 and intervenor in No. 18,235.
 Mr. Robert N. Kharasch, Washington, D.C., with whom Mr. William J. Lippman and Mrs. Amy Scupi, Washington, D.C., were on the brief, for petitioner in No. 18,235 and intervenor in No. 18,230.
 Mr. David P. Simerman, Atty., Federal Maritime Commission, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Asst. Atty. Gen., William H. Orrick, Jr., and Messrs. James L. Pimper, Gen. Counsel, Robert E. Mitchell, Deputy Gen. Counsel, Federal Maritime Commission, and Irwin A. Seibel, Atty., Dept. of Justice, were on the brief, for respondents.
 Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge, and WASHINGTON, Circuit Judge.
 WASHINGTON, Circuit Judge:
 
 
 1
 This litigation is before us a second time. The background of the case is set forth in our first opinion, at 112 U.S.App.D.C. 302, 302 F.2d 887 (1962). In that opinion we concluded (1) that the Federal Maritime Board properly had before it the issue whether Flota had violated Section 14, Fourth, and Section 16, First, of the Shipping Act, 46 U.S.C. 812 and 46 U.S.C. 815, as well as the question whether Flota was a common carrier; (2) that the Board could properly find, as it did, that (a) Flota was a common carrier, (b) its contract with Panama Ecuador and its refusal to grant space to Consolo were unreasonable and unjust, and (c) it was therefore in violation of the Shipping Act; (3) that we have jurisdiction to review reparation orders to the extent necessary to determine their validity; (4) that the Board was within its discretion in (a) denying prejudgment interest to Consolo, (b) refusing to begin the reparation period before Consolo had requested from Flota a fair and equitable portion of space, and (c) selecting 18.46% As the percentage allotment of Flota's banana-carrying capacity and thus the percentage of shipper's total computed net profit to which Consolo was entitled; (5) that there was sufficient evidence to support a finding of competition between Consolo and Panama Ecuador. We did, however, hold that 'the Board failed to give adequate consideration' to the question whether 'the cumulative weight of all the circumstances * * * rendered it inequitable to require reparations.' Our remand to the Federal Maritime Commission instructed it to consider this last question. Supra, 112 U.S.App.D.C. at 311, 302 F.2d at 896.[1]
 
 
 2
 In remanding we indicated our view that Flota had marshalled substantial evidence in support of its contention that the imposition of reparations would be inequitable. We indicated our view that the law was unsettled during the period for which reparations were assessed and said that the Board's conclusion that the law was settled by the Grace Line cases was a 'doubtful assumption.' We pointed out that the evidence of factual differences between Flota's situation and that of the Grace Line 'might well lead to the conclusion that Flota in good faith believed that the Grace Line case was distinguishable.' We also suggested that the time period of the Flota-Panama Ecuador contract might have seemed to be a reasonable one in light of the Grace Line decisions. We noted that Flota had reason to fear liability to Panama Ecuador had it complied with Consolo's demands for space in the absence of a declaratory order by the Board. Finally, we stated that 'Flota * * * complained, with some justification, of the two-year delay of the Board in rendering a declaratory order,' and that 'The result here is that the Board is making Flota pay reparations for the period of the Board's delay.' Supra at 311, 302 F.2d at 896.
 
 
 3
 These observations and expressions of opinion on our part were intended to serve as authoritative guidelines for the further deliberations of the Commission, to which we remanded the case for further proceedings not inconsistent with our opinion. We had hoped that further analysis or findings by the Commission would throw light on our initial impressions. We were prepared to affirm the Commission if it could establish that the circumstances were such as not to make it unfair to assess damages against Flota.
 
 
 4
 The Commission's opinion, presently under review, suggested that Flota had not acted in good faith and concluded that substantial equities in its favor were lacking. A careful examination of that opinion, the evidence relied on by the Commission and the other evidence in the case constrains us to hold that the Commission's determination ignores not only the guideposts of our original decision but also the substantial weight of the evidence before it.
 
 
 5
 Notwithstanding our conclusion to the contrary, the Commission asserted that the law was not unsettled when Flota executed the contract with Panama Ecuador in May of 1957. Instead of considering whether Flota could in good faith believe that the structural differences in its ships would make a difference to the Board, the Commission asserted: 'To rely upon their structural differences as an excuse to avoid common carrier obligations would go far toward eliminating such obligations.' The Commission dismissed Flota's filing a petition for declaratory order as a self-serving act made to preserve appearances long after its wrongdoing. The Commission rejected our suggestion that Flota is being made to pay for the Board's own delay. It also rejected our suggestion that Flota might have believed in good faith that its three-year contract with Panama Ecuador would be acceptable to the Board, in view of the 1957 Grace Line opinion authorizing a two-year contract. The Commission said 'we find it impossible to understand how Flota could have held any such belief.'
 
 
 6
 The reparation provision of the Shipping Act, 46 U.S.C. 821, is not the ordinary mode for the Commission's regulation of the shipping industry. The grant of reparations is discretionary. This agency, like the Interstate Commerce Commission, has a large range of enforcement powers to regulate its area of the economy.[2] If a party has good faith doubts about the applicability of a prior administrative adjudication to it, the party need not be its own judge. It can seek information from the agency about the applicability of the ruling to it. In our prior decision, we noted that 'a primary purpose envisaged for it (a the Administrative Procedure Act-- (is) to assist a party in governing its conduct to assist a party in governing its conduct without rendering itself liable to suit. See Administrative Procedure Act 5(d), 5 U.S.C.A. 1004(d).' Supra at 311, n. 15, 302 F.2d at 896, n. 15. If the course of action a party follows while the administrative determination is pending injures another and enriches itself, reparations to the injured party are frequently allowed. But if the course of action taken does not unduly enrich the party, and the asserted injury to another is only the loss of speculative profits, a real question arises whether reparations should be granted for the period of agency deliberation. Courts and agencies should be sensitive to the considerations of equity which may make reparations an inappropriate remedy in such cases.
 
 
 7
 We think that an objective and rational examination of all the evidence reveals such equitable factors in this case. It seems clear that Flota entertained serious doubts as to its legal obligations when Panama Ecuador exercised its renewal option in May 1957 and when Flota rejected Consolo's demand for space in August 1957. Flota's petition to the Board for a declaratory order in October 1957 is strong evidence of its good faith. The Commission found that Flota could not have acted in good faith, since its legal obligations were clear under existing law. We do not agree. We consider Flota's conduct completely consistent with its asserted good faith belief that prior Board decisions did not compel it to break its contract with Panama Ecuador.
 
 
 8
 The reasonableness of Flota's behavior in 1957 must of course be viewed in the context of the legal situation which it was then confronting. The question facing Flota in May 1957 was not whether to undertake a new contractual obligation with Panama Ecuador, as the Commission implies, but whether to comply with its previously acquired contractual obligation to Panama Ecuador which had perfected its option for a three-year renewal under its 1955 contract with Flota. In 1955, at the time of the original contract, the only relevant Board statement was the 1953 Grace Line report. The report found Grace to be a common carrier of bananas and its exclusive contractual undertaking to be an unlawful discrimination, in violation of its statutory duty to apportion its facilities ratably among shippers; but the Board issued no order pursuant to its report. It discontinued the proceedings against Grace, even though Grace did not cancel its future booking contracts. Furthermore, the Board tacitly approved a two-year advance booking contract between Grace and the complainant Consolo despite the fact that the Board's report stated that six months was the 'limit of reasonableness' for advance booking. 4 F.M.C. at 304. In short, the Board discontinued its proceeding in the face of an arrangement at odds with the principles laid down in its report. The lack of precedential value of the 1953 Grace Line report is suggested by the Board's failure to cite it in its 1957 Grace Line decision, which dealt with substantially the same problem, except on a minor point as to the necessity of a tender. Under these circumstances, this report could hardly have been considered an 'authoritative pronouncement,' in 1955 or in May 1957, when the contract renewal option was exercised.
 
 
 9
 In deciding whether or not it was obliged to terminate its contract with Panama Ecuador in May 1957, Flota also had before it the Board's report of April 29, 1957, in the Grace Line matter, for such guidance as it provided.[3] This report, holding that Grace was a common carrier of bananas, rested primarily on the unprecedented theory that since bananas were 'susceptible to common carriage,' they could be carried by a common carrier only under terms of common carriage. Grace had rejected the deamnds of the two complainant shippers for space; the Board concluded that 'the record discloses no convincing (nondiscriminatory) reason why any of these parties were denied space.' 5 F.M.B. at 284. But the Board held that 'in view of the economic problems presented here,' a two-year forward-booking system, excluding qualified applicants during the two-year period, was reasonable. It said that Grace must cancel its contracts with existing shippers and offer reefer space under two-year forward-booking arrangements to all qualified shippers. Although an appealable Board decision is valid until reversed, it would be an exaggeration to say that this decision settled the law in the area and provided a reliable foundation on which private parties could confidently plan their actions. The Board's 'susceptibility' theory was without precedent' the result was inconsistent with long-standing industry practice; and Grace promptly appealed the decision to the Second Circuit Court of Appeals.[4]
 
 
 10
 We are satisfied that Flota, faced with a threatened lawsuit by Panama Ecuador, acted on the basis of reasonable doubts whether its contract with Panama Ecuador was prohibited by the Shipping Act.[5] Flota's counsel had good grounds to believe that the second Grace Line report, even if valid and binding, did not cover Flota's situation and did not require abrogation of the Panama Ecuador contract.
 
 
 11
 First, Flota might reasonably have believed that its situation was factually distinguishable from Grace's-- that physical differences between Flota's ships and Grace's saved Flota's exclusive contract from being held an unreasonable discrimination. The Shipping Act prohibits 'unfair or unjustly discriminatory' contracts (46 U.S.C. 812, Fourth) and the grant of 'undue or unreasonable preference or advantage to any particular person' (46 U.S.C. 815, First). The standard of violation has built into it the concepts of fairness and reasonableness; discrimination and preferences are not per se prohibited. Hence, an agreement that might be unreasonably discriminatory if entered into by one shipping company might be entirely proper, given a different factual setting, for another company. In stressing that the factual issues were crucial to the Board's decision in Grace Line, public counsel in his brief in the Flota case noted that the 1957 Grace Line decision
 
 
 12
 'held that the carrier's duties to banana shippers would depend upon the factual circumstances attending the loading, transportation, and discharge of the bananas.'
 
 
 13
 The Grace Line decision clearly did not settle the matter of the shipping companies' obligations for the entire banana shipping industry.[6] The physical differences between Flota's and Grace's ships would make it more difficult for multiple shippers to load and stow on Flota's ships and might so disrupt its schedules as to require it to forego the carriage of bananas.[7] That Flota's contentions in this respect were far from frivolous is evidenced by respondents' justification, given in oral argument, for the Board's delay in acting on Flota's petition for declaratory judgment: 'The complexity of the issues raised by Flota before the Board was not capable of resolution overnight; indeed, in reading the Examiner's decision on the violation phase of this proceeding, it goes into great detail over the loading problem and the refrigeration problem * * *.'[8] To suggest now that Flota could not have had a good faith belief that these differences were significant,[9] after lengthy hearings were required by the Board to satisfy itself whether or not they were dispositive, is to ignore substantial justifications for Flota's course of action in May 1957.[10]
 
 
 14
 Besides its grounds for factually distinguishing the 1957 Grace Line case, Flota might have thought in good faith that its renewal agreement with Panama Ecuador was permissible within the standards set forth in the Grace Line decision. That decision states that once the shipping company has properly entered into a forward-booking agreement with one or more shippers for a reasonable period, qualified shippers who subsequently applied for space 'would be foreclosed from any proration in the space until the end of * * * (the) given period.' 5 F.M.B. at 285. Flota might reasonably have thought that its contract with Panama Ecuador was such a legitimate forward-booking agreement.
 
 
 15
 The Board's 1957 report in Grace Line stated that the duty to apportion space among several shippers arises 'where the demand for space exceeds the supply.'[11] 5 F.M.B. at 284. That report left open the question of what efforts a steamship company must make to interest shippers in its space. It stated that a shipping company must provide 'reasonable notice' before entering a forward-booking arrangement.[12] 5 F.M.B. at 286. Flota might reasonably have thought that its actions in 1955 and 1957 satisfied the requirement of providing notice to other shippers. In 1955, just prior to its entering into the basic contract with Panama Ecuador, it advertised for shippers, but received no bids in response to its advertisements. In 1957, prior to Panama Ecuador's exercise of its option, on advice of counsel, Flota considered proposals from other bidders. Pursuant to this policy, Flota gave notice to Consolo on February 26, 1957, advising him to submit a bid for the refrigerated space by a given date. There was nothing in this letter suggesting that Consolo could only bid for Flota's entire refrigerated space. Consolo and another bidder bid only for the exclusive use of the entire space.[13] No bids for less than all the space were received. While the Board could reasonably insist that Flota's obligation was actively to solicit apportioned bidding rather than merely to accept offers for apportioned space, this issue was certainly not settled by either Grace Line report.
 
 
 16
 Furthermore, Flota could reasonably have believed that the three-year period in its contract with Panama Ecuador, made in compliance with its existing contract obligation and formalized after no bids for an allocation of space had been received, was reasonable under Board standards. The agency found it 'impossible to understand' that Flota could, in good faith, entertain such a belief. Yet the Board had held Grace's two-year contracts to be of reasonable duration 'in view of the economic problems presented here (in Grace's case).' Given Flota's previous unsatisfactory experience in selling its reefer space, compared to the vigorous competition among shippers for Grace's superior facilities, the Board might well have found a three-year period to be permissible in Flota's case.
 
 
 17
 The above factors, in our view, justify Flota's doubts in May, 1957, as to whether it had a legal obligation to cancel its contract with Panama Ecuador.
 
 
 18
 On August 23, 1957, Consolo demanded a portion of the space on Flota's vessels, threatening legal action if Flota did not comply with its demands. Panama Ecuador threatened legal action if Flota leased any of its space to Consolo. Contrary to the Commission's assertion, there is no evidence to suggest that Flota was reluctant to repudiate its contract with Panama Ecuador 'because it preferred the advantages of its long-term exclusive arrangement.' Rather, in the face of pressures from both sides and uncertain as to its legal duty, Flota, on October 1, 1957, requested a ruling from the staff of the Board. Having received no answer to its request, on October 30, 1957, Flota petitioned the Board for a declaratory order. Not until six months had passed-- on May 1, 1958-- did the Board even assign a docket number to this petition; at that time it consolidated Flota's petition with Consolo's complaint seeking reparations, notwithstanding Flota's constant attempts to have its petition promptly determined, without introducing the complicated reparation issue.[14] We need not undertake a detailed examination of the specific incidents of delay. Suffice it to point out that the principal reason for much of the further delay until mid-November 1958, when Flota presented its case, was Consolo's insistance on consolidating its reparation claim with Flota's petition. Furthermore, regardless of the cause of the delay, the fact remains that virtually the entire period for which reparations were assessed covered the time when Flota's petition for a declaratory order was pending before the Board. Confronted with a difficult choice on the basis of uncertain law, Flota had sought an administrative determination of its duties as promptly as possible. On the facts of this case, it would be inequitable to make Flota pay for the Board's delay in reaching a conclusion.
 
 
 19
 Despite these factors indicating the inequity of the assessment of damages against Flota under the circumstances, the Commission nevertheless declared that 'Flota * * * is seeking to escape the consequences by passing the burden of its wrongdoing on to the party who bore the pecuniary brunt thereof. This does not appeal to our sense of equity.' We think, however, that Consolo's position is hardly deserving of greater sympathy than Flota's. In the first place, the only 'pecuniary brunt' which he bore was the loss of unrealized profits he might have made had he utilized the space which Flota failed to make available. Although Flota's action deprived Consolo of potential profits, there is no evidence that Flota in any way benefited by its exclusion of Consolo. The damages assessed by the Board are not designed to deprive Flota of illegal profits; indeed, they bear no relation to the profits Flota did or did not make on its contract with Panama Ecuador. The latter, the party which benefited from the allegedly illegal arrangement to the detriment of Consolo, was not compelled (by the nature of the remedy) to part with its 'illegal' profits. In addition, Consolo himself for four years prior to the Board's 1957 Grace Line order (effective October 1, 1957), had received the pecuniary benefits of a preferential arrangement with Grace Lines, held to be unlawful. He was never compelled to give up those profits to shippers that had been excluded.
 
 
 20
 In view of the substantial evidence showing that it would be inequitable to assess damages against Flota in favor of Consolo, we must conclude that the Commission abused the discretion granted it under Section 22 of the Shipping Act[15] in imposing reparations on petitioner. Accordingly, we reverse the Commission's decision of September 18, 1963, and direct it to vacate its reparation order issued thereunder.[16]
 
 
 21
 So ordered.
 
 
 
 [1]
 The Federal Maritime Board had by then been succeeded by the Federal Maritime Commission. See our earlier opinion: 112 U.S.App.D.C. at 304, n. 1, 302 F.2d at 889, n. 1
 The Commission's decision here under review in F.M.C. Docket No. 827 (Sub. 1), issued September 18, 1963.
 
 
 [2]
 The reparations and other enforcement sections of the Shipping Act are closely modeled on the Interstate Commerce Act. S.Rep. No. 689, 64th Cong., 1st Sess. 13 (1916). Professors Jaffe and Nathanson note the decreased importance of reparations as an enforcement device in the Interstate Commerce Commission and the declining volume of reparations cases in that agency. JAFFE AND NATHANSON, ADMINISTRATIVE LAW 150-51, 389 (2d ed. 1961)
 
 
 [3]
 5 F.M.B. 278. This report, issued April 29, 1957, was followed by an order issued August 19, 1957, see 5 F.M.B. 286. In May 1957 there was, of course, the possibility that the Board would not issue an order pursuant to its report, as in the first (1953) Grace Line matter
 
 
 [4]
 The decision was reversed by the Second Circuit and remanded. 263 F.2d 709. The Board subsequently found Grace to be a common carrier under a different theory, 5 F.M.B. 615 (1959), and the Second Circuit affirmed the decision over a strong dissent, Grace Line, Inc. v. Federal Maritime Board, 280 F.2d 790 (1960)
 
 
 [5]
 Flota's contract with Panama Ecuador contained the following clause:
 'If any provision or term hereof be invalid or unenforceable for any reason, Grancolombiana (Flota) shall have the right to terminate this contract by giving seven (7) days' written notice of termination to lessee * * *.'
 Of course, this provision did not relieve Flota of liability to Panama Ecuador if Flota guessed wrong and terminated a contract ultimately found to be valid, and Panama Ecuador had threatened legal action if Flota leased any of its space to Consolo.
 
 
 [6]
 The Board held that Grace Line had not presented facts indicating that its discrimination was reasonable. It left open the possibility that, in some future case, another shipping company could show that its exclusive booking contract for the shipment of bananas was reasonable
 
 
 [7]
 It seems uncontroverted that Grace's vessels had two and three reefer holds each, only two decks in each hold, and permanent compartments, specially designed to carry bananas. Flota's single reefer hold was designed to carry frozen cargo and had, inter alia, three decks; no compartments, fewer and smaller side ports; steeper (and hence more difficult to use) exterior and interior ramps; heavy cumbersome hatch plugs; and greater problems of refrigeration, exhaust, opening, closing and leakage of air
 
 
 [8]
 In its decision, the Commission also justified its delay as necessary because of the 'complex and lengthy hearing into the physical characteristics and utilization of its (Flota's) vessels so far as the banana trade was concerned.'
 
 
 [9]
 The Hearing Examiner in the 1957 Grace Line case noted that even as to Grace's superior facilities 'Consolo's Ecuador manager is thoroughly convinced that utter confusion would exist were there a number of shippers of bananas.' And the Examiner here found that 'the problems attendant upon the use of the Flota facilities may be more accentuated then those encountered by the shippers of bananas on the Grace vessels.'
 
 
 [10]
 It is worth noting that the banana shippers consolidated their shipments under a single operating corporation for purposes of shipping on Flota, after it opened its reefer space for multiple use in June 1959. This development lends credence to Flota's asserted belief that its reefer space was unsuitable for use by serveral shippers operating independently. Nothing in the 1957 Grace Line decision suggests that a shipping company whose ships cannot, as a matter of economic fact, be used for shipping by more than one banana shipper, must apportion its space among qualified shippers in the hope that they can arrange to unify their operations
 
 
 [11]
 The Second Circuit in Grace Line, Inc. v. Federal Maritime Board, 280 F.2d 790, 792 (1960), tacitly recognized the possibility that a carrier may enter into an exclusive contract where 'there are no competing shippers for the space granted to a preferred shipper.'
 
 
 [12]
 The order, issued on August 19, 1957, after the Panama Ecuador renewal had been executed, is more specific. It states that Grace
 'shall offer to its present shippers and to all qualified shippers * * *, upon a fair and reasonable basis and upon reasonable notice, refrigerated space for the carriage of bananas * * *.' 5 F.M.B. 287.
 
 
 [13]
 We have already indicated that Flota incurred no liability for rejecting these bids. See 112 U.S.App.D.C. at 310, 302 F.2d at 895
 
 
 [14]
 Subsequently, on November 14, 1958, over a year after Flota first petitioned for a declaratory order, the trial examiner severed the reparation issue. A reparation order did not issue until March 30, 1961
 
 
 [15]
 46 U.S.C. 821
 
 
 [16]
 In view of our disposition of this case it is unnecessary to consider petitioner's objection to the active participation of the Commission's counsel, who had earlier appeared before this court as an adversary, in the formulation and writing of the Commission's remand opinion